555 P.2d 163
**BOISE WATER CORPORATION, Appellant,**

v.

**IDAHO PUBLIC UTILITIES COMMISSION,**
**Respondent.**

No. 12028.

Supreme Court of Idaho.

Oct. 7, 1976.

Kenneth G. Bergquist, Boise, George D. Rives, of Rives, Bonyhadi & Drummond, Portland, Ore., for appellant.

Robert Jones, Asst. Atty. Gen., Boise, for appellee.

SHEPARD, Justice.

This is an appeal from an order of the Public Utilities Commission denying in part of petition by Boise Water Corporation for a rate increase.

Appellant-company assigns error to the following portions of the Order:

(1) The disallowance of a portion of the alleged cash working capital from the rate base;

(2) The disallowance of a portion of the Company's operating expenses used in calculation of the present rate of return on capital invested for rate-making purposes;

(3) The determination of the costs of each capital component within the capital structure adopted; and

(4) The overall rate of return on invested capital allowed, which Company asserts falls below the zone of reasonableness.

We set aside the Order.

Boise Water Corporation is an Idaho public utility subject to the jurisdiction of the Idaho Public Utilities Commission and serves some 26,000 water customers in and adjacent to Boise, Idaho. Its common stock is wholly owned by General Waterworks Corporation (GWC), a Delaware corporation owning 70 water, sewer and heating utility companies in the United States and Canada. GWC is in turn wholly owned by I.U. International Corporation, a multi-faceted holding company. Certain of Boise Water Corporation's administrative and billing services were provided by Management and Services Corporation, Inc. (M & S), under a contractual arrangement between the two entities. M & S is also a wholly owned subsidiary of GWC and is thus an affiliate of Boise Water. The amounts paid to M & S comprised 26% of all of the expenses of Boise Water in the administrative and billing aspects of its operation.

On February 1, 1974, Boise Water filed a petition with the Commission seeking a 37% increase in rates. Following hearings thereon the Commission granted a 4% increase in rates. Boise Water appeals from that Order asserting that the result confiscates its property without benefit of due process of law.

## I. CASH WORKING CAPITAL

Cash flow problems often confront a utility which must pay expenditures prior to the time revenues therefor have been collected. To the extent that such amount exceeds the revenue collected, it is supplied by the owners of the utility as a portion of their investment and thus be-

comes a part of the rate base. Thus, cash working capital is a recognition of the sum which the utility needs to supply from its *own* funds (rather than the rate-payer's) to meet current obligations as they arise due to the time lag between payment of expenses and collection of revenues. *Alabama-Tennessee Natural Gas Co. v. Federal Power Commission*, 3 Cir., 203 F.2d 494 (1953). Such allowances by the Commission are not guaranteed as a matter of course; the utility carries the burden of showing by competent evidence that the need therefor exists. *Application of Wilmington Suburban Water Corp.*, 203 A.2d 817, 829 (Del.1964). Traditionally, such a showing was made by producing data from the utility's actual experience showing the need resulting from the time lag in collection of revenue, i. e., from a lag study. Such procedure became overly cumbersome once the Commission satisfied itself that a formunla of allowing ⅛th of annual operating expenses was a reasonably accurate estimate for the needs of a utility billing its customers on a monthly basis. That formula—premised on monthly billings—assigns a 45-day time lag [1] and thus allocates as cash working capital ⅛th of annual operating expenses.

The Company argues that since it bills *bi*-monthly, the average lag between service and meter reading increases from 15 days (the average lag in one month) to 30 days (the average over two months), and thus it should be allowed sufficient cash working capital to last 60 days, i. e., ⅙th of annual operating expenditures. The Commission was unconvinced that the need for a greater allowance had been proved and it disallowed the portion which exceeded the usual ⅛ formula. We affirm that decision.

The record does not support the contention for a need for a greater allowance. No authority is cited indicating the necessity, let alone the propriety, of grant-

---

[1]. Apparently the 45-day figure is premised on a 30-day allowance for billing and collection plus the average delay over a month (½ of 30 days, i. e., 15 days) involved between service and the meter reading.

ing the higher rate base figure. The Company in fact has billed bi-monthly since 1971, the date of the last rate increase granted by the Commission. Since that time only the traditional ⅛th formula has been used, and the Company failed to present evidence manifesting any inadequacy of that allowance over these years despite the Commission's specific request for any such data.

The Commission noted, as shown by the proof, that the bi-monthly billing procedure saved Company substantial (though not quantified) operating costs over the previous monthly billing procedure. The Company's own evidence suggests that a ⅛th allowance would be overly generous in view of the savings made by the bi-monthly billing procedure. Accordingly, the Commission had discretion to refuse the request to increase the traditional allowance of cash working capital. *Idaho Underground Water Users Assoc. v. Idaho Power Co.*, 89 Idaho 147, 164, 404 P.2d 859 (1965); *Application of Wilmington Suburban Water Corp., supra.*

## II. OPERATING EXPENSES

To set rates allowing the utility the capability to earn a fair return upon its investment it is necessary for the Commission to ascertain first the return which is presently being received by the utility upon Company's present rate base. To accomplish that, the utility's annual revenues and net earnings must first be determined. " * * * [I]f improper items have been included in operating expenses or if operating expenses have been overstated, the current net earnings would be really * * * greater and the rate of return thus proportionately enlarged." *City of Norfolk v. Chesapeake and Potomac Tel. Co.*, 192 Va. 292, 64 S.E.2d 772, 783 (1951).

The Commission found that the Company's operating expenses. in two accounts— (1) general and administrative expenses (administrative) and (2) customer accounting and billing (billing)—had increased at a rate significantly more rapidly than could be explained by the general rate of inflation during the years of the test period. That fact led the Commission to find that Company had failed to satisfy its burden of production of evidence on the issue of whether this total increase in operating expenses was reasonable. Consequently, it disallowed that amount of the increase in the operating expenses higher than the general inflationary rate.

The Company recognizes that the initial burden of producing evidence on the issue of reasonableness of present operating expenses rested with it. It urges, however, that it met that burden and established a prima facie case of reasonableness by producing evidence that these expenses were *actually* incurred. The Commission staff (Staff) did not dispute the existence of those actual expenses. Accordingly, so goes the Company's argument, the Commission would be required on due process grounds to accept its figures in order to avoid an arbitrary and thus confiscatory result. Secondly, Company asserts that Staff failed to produce substantial evidence of such unreasonableness. Therefore, as a matter of law, it contends its expenses were established as reasonable.

We turn first to the Company's contention regarding establishment of its own prima facie case. Our analysis is complicated by the fact that 26% of all these expenditures in these two accounts were paid to Management and Services Corporation (M & S), which is similarly a wholly owned subsidiary of GWC and thus one of the Company's affiliates. Although the Company may have established actual incurrence of these operating expenses, that fact alone does not establish a prima facie case of reasonableness with respect to payments to affiliates. *Pacific Northwest Bell Tel. Co. v. Sabin*, 534 P.2d 984 (Or.App.1975); *State ex rel. Utilities Comm'n v. General Tel. of the Southeast*, 281 N.C. 318, 189 S.E.2d 705 (1972); *Re Forest Hills Utility Co.*, 91 P.U.R.3d 285 (Ohio 1971); *Re Oregon Water Corp.*, 83

P.U.R.3d 288, 293–295 (Or.1970); *Re Utah Tel. Co.,* 81 P.U.R.3d 156 (Utah 1969).

"Charges arising out of intercompany relationships between affiliated companies should be scrutinized with care [citations omitted], and if there is an absence of data and information from which the reasonableness and propriety of the services rendered and the reasonable cost of rendering such services can be ascertained by the commission, allowance is properly refused. * * *

"Moreover, the record in this case is an illustration of the fact that effective and satisfactory State regulation of utilities is made increasingly difficult by the progressive integration of utility services under holding company domination.

"The desire of public utility management, evidenced by various methods, to secure the highest possible return to the ultimate owners is incompatible with the semi-public nature of the utility business, which the management directs. It therefore follows that the commission should scrutinize carefully charges by affiliates, as inflated charges to operating company may be a means to improperly increase the allowable revenue and raise the cost to consumers of utility service as well as the unwarranted source of profit to the ultimate holding company." *Solar Electric Co. v. Pennsylvania PUC,* 137 Pa. Super. 325, 9 A.2d 447, 473 (1939).

The Company argues that these authorities are inapposite, since they involve affiliates charging for profit, noting that here M & S charged "at cost" for the services. No authority holding that such a distinction is relevant has been cited. Here we are dealing with charges for services provided by an affiliate, where the affiliate determines for itself what salaries it shall pay its employees for rendering such service and where there is no competition in the open market to determine whether such services are provided for a reasonable charge, even if "at cost." *Re Oregon Water Corp., supra,* is strikingly similar to our facts. That utility is also a subsidiary of GWC. M & S similarly provided engineering, accounting and purchasing services, for which it charged Oregon Water $35,600 during the test period under its allocation formula. The services apparently were provided "at cost." Noting that the only evidence of the reasonableness of this charge is the fact that it was charged by the affiliate based on *its own estimation* of the value of such services, the Commission disallowed the expense.

"[I]t is unrealistic to request * * * that the Commissioner rely solely on *opinion* evidence unsupported by substantial or convincing evidence of fact * * *. Here there is simply no evidence to support the allowance requested." *Ibid.* at 293 (emphasis added).

The expenses charged to M & S in this appeal were largely for salaries paid to their employees, determined by the affiliate M & S, representing its own opinion of the reasonable value of the services provided. There was no evidence supplied to substantiate that such charges—though "at cost" —reflected the reasonable market value of the services rendered. *Re Mystic Isles Water Co., Inc.,* 76 P.U.R.3d 79 (N.J. 1968), concerned a utility including in its calculation of operating expenses administrative salaries of executives serving both the utility and its affiliate. Both companies compensated them for a total annual salary of $25,000 to each executive. The regulatory commission disallowed the expense.

"Petitioner's attempt to justify these administrative salaries through testimony of its witnesses consists only of generalities and fails to establish the value of its functions [i. e., the reasonableness] of these individuals in facilitating water and sewage service * * *." *Id.* at 84 (portion in brackets added).

There is nothing in that opinion to indicate that its rationale hinged on the presence or absence of profit-making activity by the affiliate. *See also, Re Utah Tel. Co., supra; Re Forest Hills Utility, supra.*

We therefore refuse to make an exception to the rule placing upon the utility the burden of proving reasonableness of its operating expenses paid to an affiliate, which in this case comprise at least 26% of the expenses at issue. The Commission had discretion to rule that it was not persuaded by the Company's evidence that these charges were reasonable.

The Company contends in any event that it met its burden of production with respect to the other *non*-affiliated expenses by showing *actual* incurrence of the expense. We agree. The utility established a prima facie case for the reasonableness of its operating expenses to non-affiliates by showing actual incurrence. The burden then shifted to the Commission to show by substantial, competent evidence that the expenditures were unreasonable by reason of inefficiency or bad faith. *West Ohio Gas Co. v. Public Utilities Comm'n of Ohio*, 294 U.S. 63, 55 S.Ct. 316, 79 L.Ed. 761 (1935); *New England Tel. & Tel. Co. v. Dept. of Public Utilities*, 360 Mass. 443, 275 N.E.2d 493, 517 (1971). *See also, City of Norfolk v. Chesapeake & Potomac Tel. Co.*, 192 Va. 292, 64 S.E.2d 772 (1951); *Public Service Comm'n v. Ely Light & Power Co.*, 80 Nev. 312, 393 P.2d 305 (1964). *Contra: Petition of Public Service Transport*, 5 N.J. 196, 74 A.2d 580 (1950). Several of the cases cited by the Commission in opposition to this rule in fact support it when given a careful reading. *See, New England Tel. & Tel. Co. v. Dept. of Public Utilities, supra; Jager v. State*, 537 P.2d 1100 (Alaska 1975); *Application of Wilmington Suburban Water Corp.*, 211 A.2d 602 (Del.1965). Others are distinguishable: *Re Mystic Isles Water Co., Inc., supra,* and *Re Forest Hills Utility Co., supra,* dealt with expenses paid to affiliates. The reason for this distinction between affiliate and non-affiliate expenditures appears to be that the probability of unwarranted expenditures corresponds to the probability of collusion. In dealing with *non-affiliates* the pressures of a competitive market and the fact of arm's length bargaining for goods and services allows us to assume, in absence of a showing to the contrary, that such operating expenditures are legitimate.

The Commission is a fact finding, quasi-legislative body authorized to investigate and determine issues presented by a utility's petition for increased rates. Where its findings are supported by competent and substantial evidence this Court is obliged to affirm its decision. *Application of Pacific Tel. & Tel. Co.*, 71 Idaho 476, 480, 233 P.2d 1024 (1951). The Commission is not bound by technical rules of evidence in deciding such issues, since it is a quasi-legislative body. I.C. § 61–601; *Application of Citizens Utility Co.*, 82 Idaho 208, 351 P.2d 487 (1960); *Federal Mining & Smelting Co. v. Public Utilities Comm'n*, 26 Idaho 391, 143 P. 1173 (1914).

The Commission had before it the following to support its conclusion to disallow a portion of Company's operating expenses. The two accounts, billing and administrative, comprise a substantial portion of Company's operating expenses. In those categories costs were $11.71 per customer in 1969, the test year in Company's last rate increase case. By 1973, the test year for this proceeding, that cost had jumped to $18.30 per customer. That indicated an increase of over 50% in four years, though the number of employees working for Company had in fact decreased. Staff examined the Consumer Price Index, a respected indicator of inflationary trends prepared by the federal government. One witness testified that there was a high correlation between the rate of inflation, as measured by the price index, and the rate of increase in labor costs. Further, both billing and administrative services are considered highly labor intensive in terms of costs. Therefore, Staff reasoned, the Consumer Price Index was reliable evidence on the reasonableness—or lack thereof—of the cost increases Company cited as justification for increasing its rates. The rate of general inflation (expressed as a ratio of 1973 prices to 1969 prices) multiplied by

the 1969 costs per customer ($11.71) produced a 1973 figure of only $14.18 per customer, not the actual $18.30. In other words, over the previous four years Company's operation costs in billing and administrative expenses to both affiliates and non-affiliates together had increased approximately 2½ times the rate of general inflation. Administrative expenses alone had jumped from $84,000 in 1969 to $318,000 in 1973. Moreover, the general trend over a longer time frame appeared even more alarming.[2] In the face of these indications of arguably inordinate increases, Company produced no evidence to show their reasonableness or necessity.[3] Finally, Staff elicited expert testimony to the effect that computer services provided to GWC by Management and Computer Services, Inc. (MACS), for which Company paid a proportionate amount, were inefficient in view of the costs charged. In fact such services were said to be obtainable by the Company at a cost of two-third's that actually paid. The Commission further noted that in its own experience no utility's operation expenses, including that of Company, had *ever* increased so rapidly.

The Commission held that the Company had failed to establish the reasonableness of its expenses in light of the increase above the rate of general inflation, but it expressly refused to make a finding concerning use of the Consumer Price Index as a valid measure of such reasonableness. Accordingly, it did allow an increase in operation expenses, but only to the extent justified by the rate of general inflation (up to the $14.18 per customer rate). That

portion which represented a greater rate of increase was disallowed, and Company assigns that decision as error.

Substantial evidence is that which affords "a substantial basis in fact from which the fact in issue can be reasonably inferred," *NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 299–300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939). The fact in issue here is the lack of reasonableness of certain operating expenditures. The evidence recounted above provides the basis for making that inference, though reasonable minds when presented with all the evidence in the record could differ. Our sole function is to determine whether the Commission acted arbitrarily. If the record revealed only that the Company's operating expenditures in these two accounts had risen at a rate higher than the inflationary trend and that the Commission had never experienced so high a rate of increase in operating expenditures from any utility before, we might be forced to disagree with the Commission's finding and conclusion that these expenditures were unreasonable and should be disallowed in part. Such evidence would not present a rational connection between the Company's experience in operating expenditures in these accounts and what might reasonably be expected for this Company at this time.

The Commission, however did have evidence before it in the record upon which it could have relied to make that necessary connection. Staff's evidence that the Consumer Price Index accurately measures labor cost trends and that labor cost trends accurately reflect the reason-

---

2. Staff also presented evidence that administrative and billing expenses paid to M & S had leaped from 81¢ per customer in 1965 to a projected $7.35 per customer in 1974, the year following the test year. This represented an 807% increase over nine years and a jump of well over 50% from the test year to 1974 ($4.79 to $7.35). This evidence relates only to affiliate expenditures, which we have already held the Commission could disallow. Company's arguments relating to the Commission's use of such evidence therefore need not be discussed further.

3. Company did produce evidence that certain savings to Company resulted from reliance on M & S services. However, this evidence only went to the issue of whether affiliation itself in the GWC organization inured to Company's—and the Idaho rate-payer's—benefit. It did not have relevance to whether the services provided by M & S were efficiently performed with that context of a subsidiary relationship.

able trend in costs in the billing and administrative accounts (since these accounts are highly labor intensive) provided a "substantial basis in fact" to infer excessive expenditures. Had the Commission made findings accepting both of these premises presented by staff, we would be constrained to affirm their decision in disallowing the portion of the operating expenditures. However it did not. In making its determinations the Commission must present in its order the basic (not merely "ultimate") facts necessary to support reasonably its conclusion regarding facts in issue. An "ultimate fact" is generally expressed in the language of a statutory standard, such as "the rate is reasonable;" "the action is in the public interest." "Basic facts" are those upon which the ultimate fact rests. They are more detailed, but are not so detailed as a summary of the evidence. "The findings need not take any particular form so long as they fairly disclose * * * the basic facts upon which the board relies and its ultimate conclusions therefrom * * *." *Pennsylvania R. Co. v. Dept. of Pub. Utilities*, 14 N.J. 411, 102 A.2d 618, 631 (N.J. 1954); Davis, Administrative Law, § 16.06, 450–451 (1958). *See*, Davis, Administrative Law, § 16.06, 449–454 (1958); *Idaho Underground Water User's Assoc. v. Idaho Power Co., supra,* 89 Idaho at 155, 404 P. 2d 859; *Mountain View Rural Tel. Co. v. Interstate Tel. Co.,* 55 Idaho 514, 46 P.2d 723 (1935). What is essential are sufficient findings to permit the reviewing court to determine that the Commission has acted non-arbitrarily. That function we cannot perform here. We have held that, as to non-affiliated expenses in the administrative and billing accounts, the Company has satisfied its burden of production on the question of reasonableness. That conclusion the Commission had rejected below. The burden shifted to the Staff to counter with substantial evidence, enabling the Commission to exercise its discretion in determining whether Company had satisfied its burden of *persuasion.*

For the evidence to be persuasive in this case, the Commission had to accept that the Consumer Price Index was a reliable indicator of labor cost trends and that the cost in these two accounts would correlate with such a trend. That finding it expressly avoided.

The Company asserts that the Commission was without power to find the operating expenses unreasonable without finding "specific" ledger items wasteful, inefficient or expended in bad faith on the basis of competent evidence. *See*, e. g., *West Ohio Gas Co. v. PUC of Ohio,* 294 U.S. 63, 55 S.Ct. 316, 79 L.Ed. 761 (1935); *Application of Wilmington Suburban Water Corp.,* 211 A.2d 602 (Del.1965); *Re Accounting and Rate Case Treatment of Liberalized Depreciation,* 49 P.U.R.3d 1, 36 (1963); *Public Service Comm'n v. Ely Light & Power Co.,* 80 Nev. 312, 393 P.2d 305 (1964). None of Company's cited authorities involved facts where the Commission had competent evidence of unreasonable expenditures with respect to the two accounts viewed in the aggregate. The evidence in this record would support a conclusion that these expenses have risen too rapidly. That is enough given our limited authority on review.

■ Since we cannot affirm the Commission's Order in its entirety nor remand portions for further treatment below, we must set it aside in all respects. Idaho Constitution, Art. V, § 9; I.C. § 61–629; *Intermountain Gas Co. v. Idaho Public Utilities Commission,* 97 Idaho 113, 540 P. 2d 775, 791–792.

In the event that Company petitions to amend the Order and the Commission rejects the evidence concerning the Consumer Price Index, we should also note that there appears to be sufficient evidence, though conflicting, to support disallowances of those portions of the operating expenditures which were attributable to MACS or South County Water Corporation.

### III. CAPITAL STRUCTURE

■ "Capital structure" refers to the mix of long-term debt and equity (common and preferred stock) used to finance the utility's operations. It is used to determine the cost of capital, which in turn enables the Commission to ascertain the fair rate of return on investment allowable to Company. *See,* Bonbright, Principles of Public Utility Rates (1961) 240–243. At the hearing both Staff and Company presented an expert to testify on the issue of the appropriate capital structure for rate setting purposes. Both witnesses stated that the structure of the parent corporation, GWC, should be used "since it provides all the capital." Such a technique is frequently used where a subsidiary is wholly owned by a parent corporation. *See, Application of Wilmington Suburban Water Corp.,* 203 A.2d 817 (Del.Super.1968); *Lower Paxton Township v. Commonwealth, Pub. Util. Comm'n,* 13 Pa.Cmwlth. 135, 317 A.2d 917 (1974); Nichols and Welch, Ruling Principles of Utility Regulation Rate of Return, Supplement A (1964) 129–137.

The Commission, however, rejected that conclusion.[4] It stated that the capital structure of GWC provided merely a "hypothetical" structure for rate setting purposes. It found that this structure was "unacceptable" and "not in accordance with sound financial management." Such was merely conclusory. The Commission then attempted to ascertain a "proper" capital structure for Company by reference to the last rate case presented by Company in 1971. Capital donated by GWC at that time to Company similarly was not designated as coming from either debt or equity of the parent corporation. That previous Order had adjusted the capital structure for Company to "reflect the historical capital ratios for applicant." The Commission here indicated that it had found no evidence to justify divergence from the equity to debt ratio

used in that previous Order. It therefore adjusted the capital structure of Company to the historically accepted structure of 60% debt and 40% equity.

The Company argues that the Commission erred in rejecting the testimony of both experts on this issue of the appropriate capital structure without support of substantial and competent evidence in the record. *See, Application of Intermountain Gas Co.,* 77 Idaho 188, 202, 289 P.2d 933 (1955). The question before us then is whether the record supports the conclusion by the Commission that the capital structure of the parent corporation evidences unsound financial management and is therefore inappropriate for use in determining the capital structure for its subsidiary.

As noted above, the Order itself failed to specify what evidence the Commission relied upon in making that determination. Reference to the 1971 case merely aided the Commission in determining what alternative capital structure to select. Labelling GWC's structure as "hypothetical" for rate-setting purposes is of little help; any other. capital structure in this situation, including the one adopted by the Commission, is even more so.

Counsel for the Commission on appeal points to evidence in the record of a regression study performed by an expert called by Staff, which study counsel asserts substantiates the Commission's determination. That study was of the cost of equity capital of 18 of the 70 subsidiaries of GWC. It revealed that 16 of those 18 subsidiaries had a greater business risk than did the Company here. Other evidence showed that the cost of equity varies with the amount of business risk and that GWC's cost of equity is an average of the cost of equity to all of its 70 subsidiaries. Since the cost of equity varies with the amount of business risk and since the busi-

---

4. The Commission had furthermore required Company to submit a pro forma capital structure based on the assumption that no financing was obtained from GWC. It also reject- ed the figures and assumptions of that pro forma statement. In view of the analysis given here, however, that issue need not be addressed.

ness risk for the Company here can be presumed to be lower than that of the average of all subsidiaries of GWC, Staff's expert reasoned that the Company's cost of equity would be lower than the cost of equity to GWC.

The expert then went on, however, to note that a distinction must be made between business risk and financial risk. Financial risk pertains solely to the risk inherent in a corporation's capital structure. It increases as the firm's borrowings increase relative to its equity position. Business risk pertains to a risk inherent in a company's operations, independent of its capital structure or its financial mix. Public utility companies have different degrees of business risk as a result of varying economic conditions in the service areas, different regulatory climates in different states, different labor markets and even different weather conditions and climates. Consequently, business risk is directly related to the ability of a firm to generate revenue from its present and future operations. Financial risk is not subject to such variables, according to this expert. Immediately after stating the difference between the two kinds of risk and the fact that Company had a lower cost of equity than GWC, he nevertheless noted that the financial risk of all subsidiaries of GWC are identical. "Consequently," he said, *"it is inappropriate to use each subsidiary's individual capital structure* in arriving at the subsidiary's cost of capital." (Emphasis added.) The proper capital structure, the Staff's expert noted, would be that of GWC. Insofar as we can determine there is nothing in the record which supports a different conclusion, and the Commission and its counsel point to none.

We hold that the Commission either had no evidence or made inadequate findings with respect to available evidence to support its conclusion to reject the capital structure of Company's parent corporation. We need not and do not hold that the Commission was bound by the testimony of expert witnesses. Nor do we hold

that the Commission must accept for rate-making purposes the actual capital structure of the utility if it finds, on the basis of substantial evidence, that that structure is unreasonably constructed. *See,* e.g., *New England Tel. & Tel. Co. v. State,* 98 N.H. 211, 97 A.2d 213 (1953). If it in its own expertise has the background from which to disagree with the conclusions of other experts, it may do so. However, if it chooses to do so, it must refer to matters in the record to substantiate its conclusion or place such matters in the record itself. *See, Application of Citizens Utility Co.,* 82 Idaho 208, 351 P.2d 487 (1960); *Davis, supra,* § 16.06 at 450–451. *See also, Washington Gas & Light Co. v. Pub. Util. Comm'n of D.C.,* 55 F.Supp. 627. That much at least is required in order to enable the reviewing court to determine that the Commission's decision is not capricious or arbitrary and thus not a denial of due process of law. *See, Davis, supra,* § 16.05 at 444–449.

In this connection we might note that there did exist in the record evidence which might have allowed the Commission to reject the testimony of the experts had it chosen to do so. (We stress that it did not.) Although both experts testified that the proper structure was that of the parent corporation, that testimony was apparently premised on the assumption that Company was *wholly* financed by GWC. Yet, there was also uncontroverted evidence that Company was financed in part (12%) from sources external to GWC—from Company's own preferred shareholders. Neither the experts nor the Commission chose to discuss the impact that fact would have on whether to accept or reject the parent corporation's capital structure as the structure for Company. External financing from preferred shareholders had no bearing on the question of unsound financial management and that conclusion was the sole basis upon which the Commission purported to reject the capital structure of the parent. We cannot hold that evidence of preferred

stockholding substantiates the Commission's decision. It may be that either the regression study or the evidence relating to preferred stockholding supports the Commission's conclusion. The evidence appears to the contrary.

"The difficulty is that it has not said so with the simplicity and clearness through which a halting impression ripens into reasonable certitude. In the end we are left to spell out, to argue, to choose between conflicting inferences * * *. We must know what a decision means before the duty becomes ours to say whether it is right or wrong." *United States v. Chicago, M., St. P. & P.R.R.,* 294 U.S. 499, 510–511, 55 S.Ct. 462, 467, 79 L.Ed. 1023 (1935) (Cardozo, J.).

## IV. COST OF CAPITAL

### A. *Cost of Debt*

To determine the cost of capital it is necessary to ascertain the respective costs of its components, i.e., long-term debt, preferred stock and common stock. "As to debt capital this means that the company is entitled to earnings which will pay its actual interest obligations as they accrue on existing debt capital and upon new debt capital required in the immediate future, and as to stock capital * * * it means 'the amount which the company would have to pay in order to "hire" its equity capital under current conditions.' " *New England Tel. & Tel. Co. v. Dept. of Pub. Util.,* 327 Mass. 81, 97 N.E.2d 509, 513, (1951).

■ The facts are undisputed that the cost of debt to the parent corporation was 7.6%. Since the Commission rejected the use of the parent corporation's capital structure for rate-setting purposes it similarly rejected evidence of the cost of debt based on that capital structure. The Company assigns that decision as error. Having determined that the record does not support the Commission's rejection of the parent capital structure we must similarly hold that it was error to reject the evidence of the cost of debt based thereon.

[Further proceedings may ensue and the Commission may again and validly reject the capital structure of the parent corporation. Therefore we consider the following issue.] The Commission requested and the Company presented a pro forma statement of its capital structure without regard to the parent corporation's structure. Therein the Company included in its cost of debt the cost of Series B bonds at a 13.5% cost rate. This was premised on projected retirement of bonds in June of 1975 and replacement at that higher cost rate. This projected retirement/replacement was to take place five months from the date of the hearing and 1½ years after the test year. The Company had also presented evidence that the cost of A-rated bonds at the time of hearing was 10.47%. The Commission rejected the Company's evidence of the cost of such bonds and assigned the historical cost of 3.5%. It apparently based that determination on grounds that the proffered figures were too hypothetical for costs so far into the future.

■ The Company, as applicant, had the burden of presenting evidence as to the cost of debt as of the time it anticipated the issuance of the bonds. While the Commission may have sufficient expertise to supply the deficiency in the evidence of the Company, it is not required to speculate on the cost of debt at a time in the future. *Connecticut Natural Gas Corp. v. Pub. Util. Comm'n,* 29 Conn.Sup. 711, 289 A.2d 711, 718 (Conn.Sup.1971). Cf. *Re New Haven Water Co.,* 6 P.U.R.4th 166 (Conn.1974). Here the Commission had before it testimony by a staff expert witness to the effect that the interest rates as of the time of hearing were close to "historic highs" and that it was unrealistic to assume that those rates would indefinitely remain at that level. We note, however, that upon its petition for rehearing the Company specifically requested the opportunity to present additional evidence relating to the costs of debt. That petition was filed in July 1975 and rather obviously

such tendered evidence would weigh heavily on the cost of debt resulting from the retirement and replacement of bonds in June of 1975. The uncertainty and difficulty of predicting the bond market five months in advance of the issuance of the bonds would disappear in the face of actual accomplishment of the retirement and reissuance. Hence, we hold the Commission erred in rejecting the proffered evidence of the Company in its petition for rehearing.

## B. *Cost of Equity*

The Commission assigned a 10% figure to the cost of equity instead of a 13% figure sought by Company. The Commission's determination was based on the regression study mentioned above and the conclusions Staff's expert drew from it. The Company argues first that the regression study does not support the 10% figure, because the study did not compare the business stability of Company with GWC but only with other subsidiaries. The Staff's expert concluded that equity capital would cost the Company less than it would cost GWC since Company carried a lower business risk. The cost to GWC would be the average of the capital costs to all of its subsidiaries. The Staff witness used three statistical methods by which to ascertain the cost of equity. These methods confirmed that the costs of equity to Company should range between 9.5% and 10.0%. Therefore the Commission had substantial evidence upon which to base its determination that the cost of equity capital to Company was 10%.

The Company also argues that the Commission's allowance of 10% as the cost of equity was too low because it was premised on a capital structure comprised of 43% common equity and the Commission only allowed a 28% equity component in its order. That argument becomes relevant only if the Commission in further proceedings again assigns to the capital structure —this time validly—a mix containing 28% common equity. The present state of the record does not demonstrate that a different mix of capital equity would necessarily result in a different cost of equity. On that question the Company had and continues to bear the burden of proof.

## V. OVERALL RATE OF RETURN AND CONCLUSION

Counsel for the Commission argues that this Court can only reverse the decision of the Commission if the overall rate of return granted by the Commission (7.69%) falls below the "zone of reasonableness." *See, Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944). It is nevertheless also reversible error for the Commission not to make appropriate findings based on substantial evidence when such findings are material to the decision reached and when their absence precludes the reviewing court's ability to determine the reasonableness of the conclusions reached by the Commission. I.C. § 61–629; *Taylor v. Union Pacific R.R. Co.,* 60 Idaho 185, 89 P.2d 1005 (1939); *Mt. View World Tel. Co. v. Interstate Tel. Co.,* 55 Idaho 514, 46 P.2d 723 (1935); *Oregon Shortline R.R. Co. v. IPUC,* 47 Idaho 482, 276 P. 970 (1929); *Sun Oil Co. v. Federal Power Comm'n,* 144 U.S.App.D.C. 288, 445 F.2d 764, 771 (1971); *Kansas State Corp. Comm'n v. Federal Power Comm'n,* 8 Cir., 206 F.2d 690 (1953); *Commonwealth Tel. Co. v. Wisconsin Public Service Comm'n,* 252 Wis. 481, 32 N.W.2d 247, (1948); *Re New England T & T Co.,* 115 Vt. 494, 66A.2d 135, (1949); *Federal Power Comm'n v. Hope Natural Gas Co., supra,* 51 P.U.R.N.S. at 225 ·(Jackson, J., dissenting). Accordingly, we set aside the Order of the Commission. *Intermountain Gas Co. v. IPUC, supra.*

No costs allowed.

McFADDEN, C. J., and DONALDSON and BISTLINE, JJ., and SCOGGIN, District Judge (Ret.) concur.