673 P.2d 422

**UTAH POWER & LIGHT COMPANY, Appellant,**

v.

**IDAHO PUBLIC UTILITIES COMMISSION, Respondent.**

In the Matter of the Application of UTAH POWER & LIGHT COMPANY for Approval of its Proposed Electric Rate Schedules and Electric Service Regulations.

No. 13267.

Supreme Court of Idaho.

Dec. 14, 1983.

Wesley F. Merrill, of Merrill & Merrill, Pocatello, for appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., Michael Gilmore, Deputy Atty. Gen., Boise, for respondent.

SHEPARD, Justice.

This is an appeal by Utah Power & Light Company from orders of the Public Utilities Commission (Nos. 14348 and 14430) which denied in part Utah Power's request for a rate increase. Utah Power had requested a 52.49% rate hike, which was granted by the commission only to the extent of a rate increase of 13.3%. The issues raised here were previously treated in *Utah Power & Light Company v. Idaho Public Utilities Commission,* 102 Idaho 282, 629 P.2d 678 (1981) (*UP & L I*). Utah Power and the commission stipulated that the basis of the instant appeal was substantially identical to that of *UP & L I,* and hence the parties' request for extension of the briefing in the instant case pending the outcome of *UP & L I* was granted.

Here, Utah Power challenges a formula used by the commission in calculating the rate base of Utah Power, which formula in turn, in essence, determines the allowable rate increase. Specifically, Utah Power asserts that the commission erred in adopting an "average year rate base" rather than using a "year end rate base;" that the commission erred in refusing to include in the rate base construction work in progress, property held for future use, and certain coal inventories; that the commission erred in its adjustment of a requested allowance for Utah Power's maintenance and operation; that the commission erred in rejecting the use of an attrition factor in its rate base formula; and that the commission wrongly reduced the proposed allowance for interest return on the company's equity. We hold that the commission erred in its calculation of the rate base, and since all asserted errors pertain to the commission's method of figuring the rate base, we briefly analyze that term.

In *Intermountain Gas v. Idaho Public Utilities Commission,* 97 Idaho 113, 116, 540 P.2d 775, 778 (1975), the Court defined "rate base" as follows:

"The rate base consists of the capital invested in the utility upon which the company is entitled to a fair and just return. *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). There are two components to Intermountain's rate base: the net utility plant and the working capital. The net utility plant is the capital which the company has invested in the utility plant, consisting of the gas plant in service and construction work in progress, less the depreciation reserve and the amount the customers have contributed to the company in aid of construction. The working capital is the capital which the company has invested in the cash needs of the utility, consisting of an ' "allowance for the sum which the Company *needs to supply from its own funds* for the purpose of enabling it to meet its current obligations as they arise and to operate economically and efficiently".' *Alabama-Tennessee Natural Gas*

*Co. v. Federal Power Commission,* 203 F.2d 494, at 498 (3rd Cir.1953) (emphasis in original)."

Also, and more simply put, in *Citizens Util. Co. v. Idaho Public Util. Comm.,* 99 Idaho 164, 169, 579 P.2d 110, 115 (1978), the Court stated:

"A utility's 'rate base' represents the original cost minus depreciation of all property justifiably used by the utility in providing services to its customers. Utilities are allowed to charge customers rates which will yield a certain percentage return on the utility's total investment. Thus, the larger the utility's rate base the higher the rates utilities can charge to customers."

In the instant case, Utah Power proposed a historical test year of 1977 and proposed the use of a year end rate base for that test year. The commission adopted 1977 as a historical test year, but refused to use a year end rate base, opting instead for an average year rate base formula.

In *Citizens Util. Co. v. Idaho Public Util. Comm., supra,* 99 Idaho at 171–172, 579 P.2d at 117–118, we reviewed and approved the use of the average year rate base:

"The Commission adopted an average year rate base. An average year rate base is calculated by adding the test year opening rate base to the test year closing rate base and by dividing by two. Citizens claims that the Commission erred by adopting an average year rate base in that such a rate base will not allow Citizens to earn a reasonable return in the future. Citizens argues that the Commission should have adopted a year end rate base, current value rate base, or even a future year rate base . . .

"The purpose of appellate review by this Court of decisions by the Idaho Public Utilities Commission is 'to look at the overall effect of the rate fixed to determine whether the return to the utility is reasonable and just.' *Intermountain Gas Co. v. Idaho Public Utilities Commission,* 97 Idaho 113, 120, 540 P.2d 775, 782 (1975). After reviewing the record in

this case we cannot say that the adoption by the Commission of the average year rate base . . . resulted in an unreasonable or unjust overall return for Citizens. Consequently, we hold that the Commission's use of the average year rate base was not error."

■ Utah Power asserts that the valuation of its assets and liabilities should have been set as of the last day of the chosen test year, since that year end rate base most accurately reflected the value of those physical assets available to and used for the benefit of the customers of the company during the period in which the new rates would be in effect. On the other hand, the commission argues that the average year rate base formula better matched the company's revenues to expenses, since the commission determined that Utah Power's data submitted on the basis of a year end rate base contained certain mismatches between costs and revenues. While the company contends that such a "mismatch" is insignificant and that no "windfall" to the company results from the use of that formula, nevertheless, the evidence was conflicting on this point, and we note further that Utah Power did not conform to the commission's requirement that the data be clarified and corrected. We find no error in the commission's use of an average year rate base formula. We hold that the use of the average year rate base was and is permissible and within the discretion of the commission. That discretion of the commission will not be disturbed.

■ Utah Power next assigns error to the refusal of the commission to include in the rate base construction work in progress (CWIP) and property held for future use (PHFU). We agree.

In disallowing the CWIP factor in its calculations of the rate base, the commission made the following finding:

"The Company requests the Commission to allow inclusion of $10,714,000 in rate base so as to allow the Company to earn a return on its investment in construction work in progress. Company witnesses repeated the familiar argu-

ments. The granting of CWIP reduces the cost of the electric plant when it comes on line, lessens the need for future rate increases, generates badly needed internal cash for additional construction, and creates better quality earnings. Staff witness Holbert and Irrigators' witness Springer repeated the equally familiar counter-arguments, namely, that allowing a company to earn a return on construction work in progress destroys the incentive to finish that work speedily, puts on the ratepayers a risk which is properly born by stockholders, and creates a mismatch between those who presently pay and those who, in the future, will benefit from the electric plant when it becomes used and useful.

"The Commission has made clear its position on this issue in recent orders. See, *Application of Utah Power & Light Co.,* Case No. U–1009–83, IPUC Order No. 13448 [UP & L I]; *Application of Idaho Power Company,* Case No. U–1006–17, IPUC Order No. 13714. We are steadfastly opposed to the inclusion of CWIP in rate base. We find that the alternative method of providing an allowance for funds used during construction (AFUDC) is just and reasonable and does not deprive the Company of anything to which it is entitled. Nothing would be served by further discussion of this matter."

In *UP & L I,* we held that the value of the Huntington plant under construction was required to be included in the rate base, since it was not a conjectural or speculative adjustment. *Id.,* 102 Idaho at 284, 629 P.2d at 680. We see no reason that the same rule should not apply in the instant case. As we stated in *Citizens Util. Co. v. Idaho Public Util., supra,* 99 Idaho at 170, 579 P.2d at 116, test year data should be adjusted for anticipated and known changes where the changes are shown to be reliable and certain. The commission's finding pertaining to CWIP is set aside, as is that part of the commission's orders.

■ In *UP & L I, supra,* we dealt with the question of plant held for future use

(PHFU), and there ruled that PHFU, when known and measurable, must be reflected in the rate base. Similarly, in *Citizens Util. Co. v. Idaho Public Util., supra,* 99 Idaho at 171, 579 P.2d at 117, the Court reiterated the company's right to collect a return on necessary and prudent investments. No reason is pointed out why the same rule should not obtain in the instant case. We deem that the company's expenditures for PHFU are necessary and desirable from an economic standpoint, since they allow the company to take advantage of land opportunities that might otherwise be unavailable, allow the company to escape purchasing property at inflationary prices, and are conducive to lower customer rates in the long run. Hence, that portion of the commission's decision refusing to incorporate PHFU into the rate base is erroneous and is set aside.

Utah Power next asserts that the commission erred in disallowing its coal stockpiles in the rate base formula. Utah Power proposed that the commission include in the calculation of working capital approximately 1,500,000 tons of coal which the company had on hand on December 31, 1977, including some 180,000 tons of coal stockpiled at year end for use in the Emery plant, which was to go on line in mid-1978. The commission made two adjustments to the company's proposal. First, the commission eliminated any portion of the coal stockpile which was available in 1977 in anticipation of the startup of the Emery plant. Second, it adjusted the coal inventory, which it found to be excessive, to a level which would allow Utah Power to operate its plants for 45 days at normal load, rather than for 45 days at 100 per cent capacity.

■ Clearly, a coal stockpile for the Emery plant is includable in the rate base, under the same theory that allows CWIP and PHFU in the rate base. To the extent that the commission's order refused to include such a stockpile in the rate base, it is set aside. The company further argues that the commission exceeded its discretionary powers when it refused to include the total amount of coal inventory sought by

Utah Power in its rate base. We disagree. Utah Power is entitled to recoup in its rates its overhead costs, but the actual amount necessary to compensate the company is addressed to the sound discretion of the commission, and absent an abuse of that discretion, the commission's ruling will not be set aside. *Boise Water Corp. v. Idaho Public Util. Comm'n,* 97 Idaho 832, 555 P.2d 163 (1976); *Intermountain Gas v. Idaho Public Util. Comm'n,* 97 Idaho 113, 540 P.2d 775 (1975). On the record here, we cannot say that there is an absence of evidence to support the commission's ruling in this regard, and it is therefore affirmed.

■ It is next asserted that the commission erred in rejecting Utah Power's application for an "attrition allowance" of 3.85%. We agree and set aside that portion of the commission's ruling denying an attrition factor in the rate base formula.

In *UP & L I,* this Court defined regulatory lag or attrition:

"Regulatory lag or attrition has been defined as a 'decline in the rate of return earned * * * [occurring] when the rate base expands faster than the revenue and is caused both by inflation and by expansionistic construction programs which do not generate additional comparable revenue.' [Citations.]" *Id.,* 102 Idaho at 284, 629 P.2d at 680.

Here, the commission did not rule that the company was *not* experiencing attrition or regulatory lag. In *UP & L I,* we reversed the commission's refusal to award an attrition allowance, stating:

"Utah Power argues that their past actual rates of return on common equity have never risen to the level of the rates permitted by the Commission. A rate of return authorized by a Commission is not a guarantee of any level of revenues. [Citation.] Conflicting views exist as to whether a utility's failure to earn an authorized rate is, in and of itself, the final test of attrition. [Citations.] Nevertheless, it is clear that continuing high rates of inflation are especially damaging to electric power utilities. The impact of inflation is great on all public utilities

because their endeavors are normally capital intensive and involve assets with relatively long useful lives. [Citation.] Inflation is particularly painful to electric-power utilities since they are the most capital-intensive industry in the United States. [Citation.]

\* \* \* \* . \* \*

"The Commission has the power and the *duty* to set rates of return within a 'broad zone of reasonableness.' [Citation.] Here, however, the Commission eliminated from Utah Power's allowable return on equity a 1% attrition allowance. It is undisputed that a rate of return incorporating such attrition or regulatory lag was within the zone of 'reasonableness' in the prior year and was so ordered by the Commission. It also appears undisputed that the factors of inflation and an expansionistic construction program continue to exist and apparently were not considered by the Commission. Hence, that portion of the Commission's ruling eliminating the 1% previously allowed regulatory lag or attrition is without foundation in the evidence and is set aside." 102 Idaho at 284–285, 629 P.2d at 680–691. (Emphasis in original.)

Albeit the commission stated certain conclusions regarding the attrition problem, we discern that the commission likely was unwilling to consider such an allowance for attrition or regulatory lag in any event. We do not state that an attrition allowance will now be mandatory in every public utility rate order, but we hold that the order at issue here is unclear as to the reason for the denial. Further, the commission at the time of this order did not have the benefit of our opinion in *UP & L I.* Hence the commission's order respecting attrition or regulatory lag is set aside, and on remand the commission is directed to reconsider the matter of attrition or regulatory lag, in accordance with *UP & L I.*

■ Utah Power also asserts that the commission erred in allowing it only a 13.5% return on equity in calculating Utah Power's rate base. It is argued, and we agree, that a public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public, equal to the return generally being made at the same time and in the same general part of the country on investments and other business undertakings which are attended by corresponding risks and uncertainties. *Blue Field Water Works & Improvement Co. v. Public Service Comm.,* 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923).

■ We do not agree, however, with the assertion of Utah Power that a 13.5% return on common equity in the instant case is totally arbitrary and confiscatory. In *UP & L I,* we reviewed and approved an order of the commission allowing a 13.5% return to common equity based on an average rate base test year 1976. We are not persuaded of the unreasonableness of the commission's action here in using the same 13.5% figure for an average rate base 1977 test year.

We have examined the remainder of Utah Power's assertions of error and find them to be without merit. The orders and rulings of the Public Utilities Commission are affirmed in part, set aside in part, and remanded for further proceedings in accordance herewith. Costs to appellant Utah Power. No attorneys' fees allowed.

BAKES, J., and McFADDEN, J. Pro Tem., concur.

DONALDSON, Chief Justice, concurring and dissenting.

I concur in most of the opinion except that part which states that construction work in progress (C.W.I.P.) should be included in the rate base. The alternative method which the Commission chose of providing an allowance for funds used during construction is just and reasonable. Which method to use was for the Commission to decide since it is within their realm of expertise. This Court should not substitute its opinion for that of the Commission's.

Again, as I stated in my special concurrence in *Utah Power & Light Company v. Idaho Public Utilities Commission,* 102 Ida-

ho 282, 629 P.2d 678 (1981), the Commission should either have allowed the items of construction work in progress and plant held for future use or regulatory lag (an attrition allowance).

By this means, the Commission could hopefully avoid the necessity of having rate hearings every few months. This would be a savings of time and effort for everyone concerned.

BISTLINE, Justice, concurring and dissenting.

I concur in those portions of the Court's opinion which upholds the Commission's use of an average year as opposed to an end-of-year rate base; which upholds the Commission's coal inventory adjustment; and which upholds the Commission's establishment of a 13.5 percent return on equity.

I dissent from the remainder of the Court's opinion which usurps the Commission's ratemaking function for that of its own. This Court's scope of review on appeal in cases such as this is limited to determining whether the Commission regularly pursued its authority and whether the constitutional rights of the utility have been violated by the fixing of rates which are unjust or unreasonable and thus confiscatory. *Utah Power & Light Co. v. Idaho Public Utilities Commission,* 102 Idaho 282, 284, 629 P.2d 678 (1981) (UP & L I) (Bistline, J., dissenting, p. 285, 629 P.2d 678).

CONSTRUCTION WORK IN PROGRESS

The Court today sets aside the Commission determination to not include construction work in progress (CWIP) in UP & L's test year data. The Court cites *Citizens Utility Co. v. Idaho Public Utilities Commission,* 99 Idaho at 170, 579 P.2d 110 (1978), for the proposition that test year data should be adjusted for anticipated and known changes where the changes are shown to be reliable and certain, thus holding that the Commission erred in not including CWIP in the 1977 rate base. *See UP & L I, supra.* The Court today thus follows its recent trend of re-examining each component of a Commission ratemak-

ing decision and determining for itself what it, if it were the Commission (which perhaps it is), would have included in a utility's rate base. As I stated in *UP & L I,* the Court's function is to determine if the overall rate allowed by the Commission is reasonable and just, not whether or when a plant or any given item is to be included in the rate base:

> " 'The standard to be applied in appellate review of utility cases was articulated in *Intermountain Gas Co. v. Idaho Public Utilities Commission,* 97 Idaho 113, 540 P.2d 775 (1975):
>
> > "Our purpose is not to analyze each step of the rate-setting process to determine whether the regulatory agency was correct in its decision, but to look at the overall effect of the rate fixed to determine whether the return to the utility is reasonable and just. As the Supreme Court of the United States stated in *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944): 'It is not theory but the impact of the rate order which counts. *If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end.* The fact that the method employed to reach that result may contain infirmities is not then important. * * * ' " 540 P.2d 775, 782.' "

*UP & L I, supra,* at 286, 629 P.2d 678 (Bistline, J., dissenting) (emphasis added).

In the present case, it is clear that the Commission's decision to not allow UP & L to include CWIP in its rate base was reasonable. Inclusion of CWIP in rate base results in an uneven matching between those consumers who will pay for a construction cost and those (if any) who will ultimately benefit from the construction, by requiring consumers to pay for plants not presently serving them and which will not provide service until sometime in the future.

Additionally, it is a matter of common knowledge that utilities often construct generating capacity exceeding their retail

customers' needs. During 1980, in fact, UP & L sold 6.25 percent of its Hunter No. 1 plant to Provo City and 39.69 percent of its Hunter No. 2 plant to the Desert Generation and Transmission Co-Op realizing a net gain of over eleven million dollars. Pursuant to this Court's decision in *Boise Water Corp. v. Idaho Public Utilities Commission,* 99 Idaho 158, 578 P.2d 1089 (1978), the Commission is required to allocate to *shareholders* the gain on property to the extent it is undepreciated,[1] whether or not the property was included in the rate base and was paid for by shareholders. Today's decision can lead to the inequitable result of having ratepayers pay for plants not yet on line, with the utility thereafter selling all or a portion of the generating capacity of the plant before it comes on line, and thereby pocketing the gain from the sale returned to the shareholders per our decision in *Boise Water, supra.*

Requiring the Commission to include CWIP in rate base also leads to inequitable allocations between customer classes. UP & L, which sells energy to several jurisdictions, changes its plant allocations among the jurisdictions every year. Idaho accounted for 16 percent of UP & L's sales in 1976; 19 percent in 1977; 15.3 percent in 1978; 15.9 percent in 1979; and 14.7 percent in 1980. Thus, allocating CWIP before a plant comes on line can and often will result in inequitable misallocation of the plant between jurisdictions. An examination of the above figures demonstrates that if CWIP was included in the rate base in 1977, Idaho customers would have paid a disproportionate amount of the service that later would have been received by other regulatory jurisdictions.

The Commission should not be required to include CWIP in the utilities' rate base for the final reason that the proposed plant may never come on line. An example quite close to home is the WPPSS fiasco. Plants 4 and 5 will probably never come on line, but had they been included in the rate base,

that fruitless burden would have been paid for by ratepayers who would have received no power whatever from the plants. Traditionally, it is the investors which have been required to provide the capital required to finance new construction. Along with providing the capital, investors also have assumed the risks of new construction, such as delays in placing the plant into service and cost overruns. Requiring the CWIP to be included in the rate base nicely relieves investors of all normal risks of plant construction, but requires the hapless ratepayers to pay return on the plant before receiving any benefit. Requiring the Commission to include CWIP in the rate base shifts the risk of investment from the shareholders, where it properly belongs, to unsuspecting, and now, courtesy of the Court, unprotected ratepayers.

It is clear that the Commission, until today, was entitled to an exercise of discretion in determining whether to include CWIP in a utility's rate base. Equally clear is it that the Commission did not abuse its discretion in not allowing such a factor to go into that rate base.

## PROPERTY HELD FOR FUTURE USE

The Court today holds that property held for future use (PHFU) must be included in the rate base when known and measurable. The authority and reasoning the Court summons for this conclusion is untenable and leave me, admittedly no more of an expert in the field of public utilities regulation than my fellow brethren, at a loss.

First, the Court states that "In *UP & L I, supra,* we dealt with the question of plant held for future use (PHFU) and there ruled that PHFU, when known and measurable, must be reflected in the rate base." Unfortunately, the Court cites no page for this proposition and I have not yet located the statement therein—which may be inadequacy on my part. The Court did there hold that the Commission erred in failing to include in the rate base certain adjustments

1. Because generating plants depreciate slowly, the gain attributable to depreciation in the case of the sale of the two Hunter plants was very small, the shareholders retaining all but 800,-000 of the gain.

to the 1976 test year data for "known and measurable" changes, the exact language being:

"Test year data should be adjusted for known and measurable changes where the changes are shown to be reliable and certain. (Citations omitted.) The Commission should include in the rate base all items which are proven with reasonable certainty to be *justifiably used by the utility in providing services to its customers.*"

*UP & L I, supra,* at 284, 629 P.2d at 680 (emphasis added).

The Court then ruled that the Commission erred in refusing to include in the rate base the Huntington and Coal Creek plants. In *UP & L I* the Court, rather than holding that PHFU must be included in the rate base, stated that "We have examined Utah Power's other assertions of error [one of which was that PHFU should be included in the rate base] and find them to be without merit." *Id.* at 285, 629 P.2d at 681.

The Court, in *UP & L I,* reiterated the doctrine that customers should only have to pay for items "justifiably used by the utility in providing services," applying the doctrine that customers need only pay for those items used and useful. The Commission in the present case denied UP & L's request for seven million dollars in PFHU expenditures finding that:

"Staff witness Holbert proposed elimination of this entire item from rate base on the grounds that it does not represent any plant which is now used and useful. This it is not properly charged to current ratepayers. In addition, Holbert testified that the breakdown of numbers in this category reveals that approximately $4 million is for mineral rights, $2 million for unit # 4 in the Company's Naughton complex, and $1 million for future substation rights."

R., p. 69.

The Commission found, as a matter of fact, that the PFHU expenditures requested by UP & L to be included in the rate base were not for used and useful expenditures. This finding is not controverted by the Court

and more than adequately supports the Commission's decision to not allow this item in UP & L's rate base. Such a result is mandated by our decision in *UP & L I,* not the contrary as is posited by the Court today.

Secondly, as a purported foundation for its conclusion it is said that:

"Similarly, in *Citizens Utilities Co. v. Idaho Public Utilities Commission,* supra, 99 Idaho at 171, 579 P.2d at 117, the Court reiterated the company's right to collect a return on necessary and prudent investments. No reason is pointed out why the same rule should not obtain in the instant case."

The Court errs on both points. In *Citizens,* this Court did not reiterate the company's right to collect return on necessary and prudent investments but held that the Commission erred in not including $8,000 in minimum checking account balances required in order for the utility to obtain low interest loans and in excluding from the rate base the cost of a billing machine which the Court held to be an anticipated and known change which was both reliable and certain. The Court stated only that:

"The Commission should include in the rate base all items which are proven with reasonable certainty to be justifiably used in providing services."

*Id.* at 171, 579 P.2d 110.

This is the same statement made by the Court in *UP & L I, supra,* which, as discussed *supra,* prohibits the Commission from including in the rate base any items not used and useful. Second, the Commission did point out why the same "rule" should not apply in this case:

"[UP & L] submits 'that this case presents the identical issue which was considered by this court in *Citizens Utilities Company v. Idaho Public Utilities Commission,* 99 Idaho 164, 579 P.2d 110 (1978),' id. at 47. *Citizens* did not consider property held for future use. But the Company argues that it is identical for ratemaking purposes to minimum checking account balances that Citizens was required to maintain. The Company

cites no testimony in the record or legal authority for its equation of property held for future use with minimum checking account balances. The Court found in *Citizens* that checking account balances were an integral part of the capital structure because they allowed it to take advanatage of low interest rates when needed, i.e., the Court found that these balances had been and would be used and useful to the ratepayers. By contrast, none of the land interests included in the Company's property held for future use had then been dedicated to construction work in progress, let alone dedicated to service to the Company's customers.

"The Company's property held for future use was not at the time of the hearing and had never before been of service to the ratepayers. It may be in the future. On the other hand, it may be sold before it is placed in service, and the Company's shareholders would then be entitled to all gain from the sale under the Court's holding in *Boise Water*.[2] Until these properties are dedicated to service of the ratepayers, the Commission may exclude them from the rate base." Respondent's Brief, p. 53.

Lastly, the Court premises its conclusion that PHFU must be included in UP & L's rate base on the fact that it "deem[s] that the company's expenditures for PHFU are necessary and desirable from an economic standpoint, since they allow the company to take advantage of land opportunities that might otherwise be unavailable, allow the company to escape purchasing property at inflationary prices, and are conducive to lower customer rates in the long run." It is in this statement that is found the basic error in the Court's logic—that it is for this Court to make policy and to *deem* what is best for the utilities—a function heretofore firmly vested in the Commission. It is not this Court's province to be a super-Commission but merely to determine whether the Commission has abused its discretion in setting confiscatory and unconstitutional rates.

Commentators might well perceive that it is this Court which oversteps its bounds and acts outside its jurisdiction and thus unconstitutionally in the setting of rates.

## COAL STOCKPILE

Based on my dissent from those portions of the Court's opinion which holds that CWIP and PHFU are required to be included in the utility's rate base, I also dissent from that portion of the Court's opinion which holds that a coal stockpile for the Emery plant is includable in the rate base, "under the same theory that allows CWIP and PHFU in the rate base."

## ATTRITION ALLOWANCE

In setting aside the Commission's order respecting attrition or regulatory lag, the Court states that "Albeit the commission stated certain conclusions regarding the attrition problem, we *discern* that the commission *likely* was unwilling to consider such an allowance for attrition or regulatory lag in any event. We do not state that an attrition allowance will be mandatory in every public utility rate order, but we hold that the order at issue here is unclear as to the reason for the denial." I confess to being at a loss to see how the Commission could have made its decision any clearer or from what evidence the Court is able to *discern* that the Commission "likely was unwilling to consider such an allowance for attrition or regulatory lag." For the benefit of those interested, the Commission's findings and conclusions are here set out in full:

## "V.  ATTRITION ALLOWANCE

"Utah Power & Light has requested additional rate relief in the form of what it labels an 'attrition allowance.' Assuming that the final Order in this case had been released on August 1, 1978, the Company alleged a need for an additional $9,791,000 in rate relief. Assuming a release date of

**2.** See the discussion *supra* regarding the requirement that the gains on property to the extent they are not depreciated must be credit-

ed to shareholders rather than to ratepayers, who under today's opinion will be paying for PHFU.

October 1, 1978, the attrition allowance jumps to an additional $32,001,000. Presumably, the actual release date would warrant still further relief. Throughout this case UP & L has had some difficulty in defining precisely what it means by 'attrition.' As the Company's post hearing brief candidly admits, the record at times defines the problem in terms of erosion of earnings due to rapid expansion in an inflationary era, while at other times it focuses on 'regulatory lag.' For example, Company witness Mr. Colby seemed to place exclusive emphasis on the so-called problem of regulatory lag: 'There is no thought of it compensating for future inflation. Only regulatory lag, as I understand it.' The Company brief, by contrast, states that 'the problem is one of a utility's inability to earn the allowed or determined just and reasonable rate of return due to economic causes *or* lapse of time in realizing effective relief.' (Emphasis added.) In yet a third formulation, the brief separates out the problem of 'attrition' from that of 'regulatory lag' and says that the latter only 'accentuates' the former.

"The bottom line appears to be that Utah Power & Light feels 'attrition' has occurred whenever the Company fails to earn the rate of return which the Commission has determined to be just and reasonable. As the prime example of this, Company witnesses Colby and Hoskins both stressed what they alleged to be the fact that, during 1977, the Commission allowed a 13.5 percent return on equity whereas, in Idaho, the Company earned only 6.72 percent.

"There are numerous problems with this approach. First, the Company's rate of return figure is no better than the calculations upon which it is based. The Company calculates its Idaho rate of return based, among other things, upon (1) the use of an inflated year-end rate base without pro-forming the year's revenues to match; (2) the inclusion of CWIP in rate base; (3) the inclusion of Plant Held for Future Use in rate base; (4) the exclusion of pre-1971 investment tax credits from its capital structure; and (5) an overstatement of working capital by nearly 50 percent. As the above discussion of each of these items

makes clear, this Commission does not accept the Company's method of making these calculations. Consequently, the allegedly 'disastrous' 6.72 percent rate of return in Idaho is meaningless.

"Secondly, the Company fails to separate out the various causes which may contribute to erosion of earnings. In 1977, for example, the Company experienced a severe plant outage due to an explosion in one of its Huntington Units. By its own admission, this event which was exacerbated by drought conditions prevailing at the time, caused the Company to lose more than $7 million in gross revenue. In addition, the Company experienced severe and abnormal losses due to a major coal strike of unusually long duration. The point is, as Dr. Fitzpatrick observed, that not every failure to earn the rate which is authorized is due to attrition.

"Yet a third difficulty arises from the Company's expansive definition of 'attrition.' The Company, in its brief, would go so far as to include in this definition a factor such as 'the time it takes for a company to recognize the need for a rate increase' and 'delays in filing for rate increases.' These items, which are purely within management control, are then deemed not to be 'a question of fault or responsibility' but rather to be 'an inherent problem in an expanding economy and an area of construction and growth of the utility.' This simply will not do. The Company cannot label as 'attrition,' everything from management error to acts of God. At no time has the Company attempted to separate out the various factors which cause its alleged failure to earn its allowed rate of return, to quantify these factors, and to pinpoint those which, in any sophisticated economic sense, might truly be attributed to 'attrition.'[1] Absent such a demonstration, the Company has failed to shoulder and to carry its burden of proof in alleging the need for an 'attrition allowance.' The Company has demonstrated *a revenue deficiency,* nothing more.

"We take this opportunity to note that this Commission is not insensitive to the

economic hardship confronting the utilities subject to our jurisdiction in these inflationary times. We have, when the·occasion warranted it, granted interim relief to companies facing emergency situations. *See Application of Idaho Power Co.,* Case No. U–1006–117, IPUC Order No. 13158; *Application of Utah Power & Light Co.,* Case No. U–1009–73, IPUC Order No. 12275.

"In addition, the Idaho legislature, by its amendment of *Idaho Code* § 61–622, set an outside limit of nine months for Commission deliberation on requests for rate relief, thereby manifesting its concern for the prompt disposition of rate cases. This statutory protection, combined with the right to petition for interim rate relief, provides a Company with adequate safeguards against the problem of regulatory lag.

"Within this framework, we encourage timely filing by a Company when rate relief is necessary. We note, for example, that Utah Power & Light has filed its next rate case—Case No. U–1009–100—during the very week this Order is being released. This is in marked contrast to the present case which was filed almost seven months after the Commission's first determination of the Company's need for rate relief. [Footnote omitted.]

"Moreover, we have tolerated the use of partial test years in the submission of rate cases. For example, in Case No. U–1009–100, just recently filed with this Commission, Utah Power & Light has submitted seven months actual data and, as the case progresses, will replace the forecasted data for the other five months of its test year with actual numbers.

"A final word. Whatever problem of 'regulatory lag' may be said to exist is largely of the Company's own making. These proceedings were extended to and prolonged beyond the normal seven month period because the Company continues to relitigate, in each and every case, issues on which this Commission has adopted firm policy positions. These issues include the rejection of a year-end rate base without proformed revenues and the exclusion from rate base of CWIP and of Plant Held for Future use. By continually filing applications in this format, the company forces numerous production requests and prolongs these proceedings beyond what would otherwise be necessary.

"The above approaches, repeatedly endorsed by witnesses at these hearings, are already being implemented in cases before this Commission. We find them adequate to cope with the problems of attrition and regulatory lag when such problems can be shown to be significant. We find, in the present case, that Utah Power & Light has borne its burden of proving the existence of a revenue deficiency, but has not demonstrated the existence of a significant problem as regards either attrition or regulatory lag. The Company's request for an 'attrition allowance' of between $9,000,000 and $32,000,000 is therefore denied.

[1] A generally acceptable definition of attrition as applied to the utility industry is as follows:

It is the decline in the per cent earned on the rate base due to the replacement of plant items at price levels higher than those experienced when the original plant items were installed; it also comes about by additions to plant at a unit cost higher than the average cost of existing units.

The 1958 National Association of Railroad and Utilities Commissioners report of annual proceedings, pp. 148, 156."

R., pp. 80–83.