629 P.2d 678

**UTAH POWER & LIGHT COMPANY, Appellant,**

**v.**

**IDAHO PUBLIC UTILITIES COMMISSION, Respondent.**

**In the Matter of the Application of UTAH POWER & LIGHT COMPANY for Approval of its Proposed Electric Rate Schedules and Electric Service Regulations.**

Nos. 12838, 12922 and 12956.

Supreme Court of Idaho.

May 5, 1981.

Rehearing Denied June 23, 1981.

Wesley F. Merrill of Merrill & Merrill, Pocatello, for appellant.

David H. Leroy, Atty. Gen., Michael S. Gilmore, Deputy Atty. Gen., Larry D. Ripley, Robert J. Ennis, Boise, Louis F. Racine, Jr., Robert Huntley, Jr., Pocatello, W. Joe Anderson, Idaho Falls, for respondent.

SHEPARD, Justice.

This is an appeal by Utah Power & Light Company from an order of the Public Utilities Commission setting rates to be charged Idaho customers for electric power delivered by Utah Power. We set aside the order of the Commission.

Utah Power is a public utility providing electrical energy to consumers in Utah, Idaho and Wyoming. Idaho consumers account for approximately 19% of Utah Power's total sales. The Idaho Commission had granted Utah Power a rate increase of 32% in 1975 and an increase of 29.5% in 1976. In December, 1976, Utah Power applied for an additional 26.58% increase in Idaho on the basis that it was necessary to meet inflationary pressures and to finance a 1.6 billion dollar program for the construction of additional facilities. In 1976, Utah Power's earnings per share and dividends rose to record high levels and their bond rating improved from "A" to "AA".

At that time the Teton Dam flood, low farm prices, and a drought had made Utah Power's southeastern Idaho service area economically depressed and at hearings held on Utah Power's application, the public response was decidedly adverse. Following those hearings and other submitted evidence, the Commission issued an electric rate schedule which had been formulated using a 1976 test year, allegedly adjusted for known and measurable changes. The Commission determined the rate base to be $129,023,655, upon which Utah Power was allocated a rate of return of 9.67%. Utah Power challenges numerous methods used by the Commission to reach that result.

The Public Utilities Commission is statutorily vested with jurisdiction to regulate rates charged by public utilities furnishing services, products or commodities in the State of Idaho. I.C. § 61–501. When the Commission finds that the rates proposed by a public utility for such services are unjust, the Commission must establish

just, reasonable or sufficient rates. I.C. § 61–502. This Court's scope of review on appeal in cases of this type is to determine only if the Commission regularly pursued its authority and whether the constitutional rights of the utility were violated by the fixing of rates which were unjust, unreasonable and thus confiscatory. I.C. § 61–629; *Utah-Idaho Sugar v. Intermountain Gas Co.*, 100 Idaho 368, 597 P.2d 1058 (1979); *Intermountain Gas Co. v. Idaho Public Utilities Comm'n*, 97 Idaho 113, 540 P.2d 775 (1975); *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944).

■ Utah Power first contends that the Commission erred by failing to make certain adjustments to the 1976 test year data for "known and measurable changes" and that such data resulted in the determination of an artificially low rate base. We agree. Test year data should be adjusted for known and measurable changes where the changes are shown to be reliable and certain. *E. g., Citizens Utility Co. v. Idaho Public Utilities Comm'n*, 99 Idaho 164, 579 P.2d 110 (1978); *Agricultural Products v. Utah Power & Light Co.*, 98 Idaho 23, 557 P.2d 617 (1976). The Commission should include in the rate base all items which are proven with reasonable certainty to be justifiably used by the utility in providing services to its customers. *Citizens Utility Co. v. Idaho Public Utilities Comm'n, supra.*

■ Utah Power asserts that the addition to the Huntington Plant and the acquisition of the Deer Creek Coal Mining properties were known and measurable changes to the 1976 test year data, should have been included in Utah Power's rate base, and were erroneously excluded. We agree. Although Utah Power's new unit at Huntington, described as "Huntington 1977," was not in use in 1976, it was scheduled to and did go on line in June of 1977. As to the Coal Mining properties, Utah Power contracted for the purchase of those properties in 1976, but possession was not actually obtained until early 1977 due to the necessity of securing approval of the purchase from the Federal Trade Commission. Utah

Power & Light presented evidence of the revenues, if any, and expenses connected with those properties. The proceedings continued into August of 1977 and the order of the Commission was not entered until September 29, 1977. It could not be said that the adjustments were "future" or unknown. The Commission's holding that the inclusion of the Huntington unit in the rate base would be solely conjectural is not supported by the evidence and is set aside. The holding of the Commission that the Deer Creek Coal Mine should not be included in the rate base is likewise unsupported by the evidence, erroneous and is set aside.

Utah Power next asserts that the Commission erred in computing the 9.67% overall rate of return based in part on an alleged inadequate 13.5% return to common equity. Although other aspects of the Commission's determination of the overall rate of return are asserted as error, we consider only the contention by Utah Power relating to the return on common equity and within that category, an adjustment for "regulatory lag." Regulatory lag or attrition has been defined as a "decline in the rate of return earned * * * [occurring] when the rate base expands faster than the revenue and is caused both by inflation and by expansionistic construction programs which do not generate additional comparable revenue." *Providence Gas Co. v. Burman*, 376 A.2d 687 (R.I.1977) (quoting from *Public Service Comm'n v. Baltimore Gas & Electric Co.*, 273 Md. 357, 329 A.2d 691 (1974).

Utah Power argues that the Commission had in the previous year awarded a 14.5% rate of return, allowing Utah Power the opportunity to earn 13.5% on common equity "with the extra 1% being in essence, an adjustment for regulatory lag." In the instant case, however, the Commission ordered the elimination of the 1% adjustment for regulatory lag. We find no evidence to support that ruling of the Commission other than the bare assertion that Utah Power had improved its financial posture in 1976 in that its earnings and dividends rose and their bond rating also improved. On the other hand, Utah Power argues that their

past actual rates of return on common equity have never risen to the level of the rates permitted by the Commission. A rate of return authorized by a Commission is not a guarantee of any level of revenues. 1 A. Priest, Principles of Public Utility Regulation 203–06 (1969). Conflicting views exist as to whether a utility's failure to earn an authorized rate is, in and of itself, the final test of attrition. *See, e. g., Public Service Commission of Maryland v. Baltimore Gas & Electric Co., supra*; Re The Narragansett Electric Co., 23 P.U.R. 4th 516 (R.I., P.U.C. 1978); Re Chesapeake & Potomac Telephone Co. of West Virginia, 18 P.U.R. 4th 236 (W.Va., P.S.C.1976). Nevertheless, it is clear that continuing high rates of inflation are especially damaging to electric power utilities. The impact of inflation is great on all public utilities because their endeavors are normally capital intensive and involve assets with relatively long useful lives. *See* Adams, Public Utility Regulation: A Public Demand, 28 Baylor L.Rev. 773 (1976). Inflation is particularly painful to electric-power utilities since they are the most capital-intensive industry in the United States. *See* Note, Efficiency and Competition in the Electric-Power Industry, 88 Yale L.J. 1511 (1979).

█ This Court has stated that the "questions of 'cost of equity' and 'rate of return' are matters which raise extremely complicated issues. Deciding these questions is a function of the Idaho Public Utilities Commission and these questions are within the Commission's area of expertise." *Citizens Utility Co. v. Idaho Public Utilities Comm'n*, 579 P.2d at 119 (1978). The Commission has the power and the *duty* to set rates of return within a "broad zone of reasonableness." *Intermountain Gas Co. v. Idaho Public Utilities Comm'n, supra.* Here, however, the Commission eliminated from Utah Power's allowable return on equity a 1% attrition allowance. It is undisputed that a rate of return incorporating such attrition or regulatory lag was within the zone of "reasonableness" in the prior year and was so ordered by the Commission. It also appears undisputed that the factors of inflation and an expansionistic construc-

tion program continue to exist and apparently were not considered by the Commission. Hence, that portion of the Commission's ruling eliminating the 1% previously allowed regulatory lag or attrition is without foundation in the evidence and is set aside.

We have examined Utah Power's other assertions of error and find them to be without merit. The order of the Commission is set aside. Costs to appellant.

BAKES, C. J., and McFADDEN, J., concur.

DONALDSON, Justice, specially concurring.

I concur with the majority opinion insofar as its holding concerning the test year. I believe that the Huntington Plant and the Deer Creek Coal Mining properties should have been included in the rate base since they were known and measurable changes for the test year with reasonable certainty. If they had been included in the rate base the rate base would have adequately demonstrated real revenue needs and thus would most likely obviate the need for any adjustment for "regulatory lag." However, the Commission also denied the request for an extra 1% adjustment for "regulatory lag." The Commission should have granted one or the other. If the Commission was not going to include the Huntington Plant and Deer Creek Coal Mining properties in the rate base then it should have granted the extra 1% adjustment for "regulatory lag." It was error to deny both and an abuse of discretion which resulted in a rate that was not just and reasonable.

BISTLINE, Justice, dissenting.

I.

At the outset it is necessary to reemphasize the limited role of this Court in reviewing decisions of the Public Utilities Commission. The extent of review is limited in I.C. § 61–629, which provides in pertinent part that "[t]he review on appeal shall not be extended further than to determine wheth-

er the Commission has regularly pursued its authority, including a determination of whether the order appealed from violates any right of the appellant under the Constitution of the United States or of the State of Idaho."

The Commission, on the other hand, has been granted the "power and jurisdiction to supervise and regulate every public utility in the state and to do all things necessary to carry out the spirit and intent of the provisions of this act," I.C. § 61–501; to determine the "just, reasonable or sufficient rates" where the rates are insufficient or unjust, unreasonable, discriminatory, preferential or unlawful, I.C. § 61–502; and to investigate and establish "new rates, fares, tolls, rentals, charges, classifications, rules, regulations, contracts or practices or schedule or schedules" for any public utility. I.C. § 61–503. The only limitation on the Commission's authority to set rates is one of reasonableness; the end result of the methods used by the Commission must produce a "reasonable and just" return. *Idaho Power Co. v. Idaho Public Utilities Commission*, 99 Idaho 374, 582 P.2d 720 (1978); *Citizens Utilities Co. v. Idaho Public Utilities Commission*, 99 Idaho 164, 579 P.2d 110 (1978). As stated in *Agricultural Products Corp. v. Utah Power & Light Co.*, 98 Idaho 23, 557 P.2d 617 (1976):

"The standard to be applied in appellate review of utility cases was articulated in *Intermountain Gas Co. v. Idaho Public Utilities Comm'n*, 97 Idaho 113, 540 P.2d 775 (1975):

'Our purpose is not to analyze each step of the rate-setting process to determine whether the regulatory agency was correct in its decision, but to look at the overall effect of the rate fixed to determine whether the return to the utility is reasonable and just. As the Supreme Court of the United States stated in *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944): "It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial in-

quiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. * * * " ' 540 P.2d 775, 782." *Id.* at 27, 557 P.2d at 621.

The reasons for granting this broad authority to the Commission and limiting the scope of review by this Court are obvious—the Commission, staffed with a group of technical advisers, has the necessary expertise to deal with the regulation of utilities. The Commission devotes itself solely to utility regulation and is in a much better position than this Court to understand and deal with the implications and intricacies of utility regulation. Thus the question on appeal is not whether we agree or disagree with what the Commission has done, but whether the Commission has regularly pursued its authority and whether the allowed return is just and reasonable.

Further, the Commission is obliged to assess the requirements of the broad public interest when it sets just and reasonable rates. *See Intermountain Gas Co. v. Idaho Public Utilities Commission*, 97 Idaho 113, 127, 540 P.2d 775, 789 (1975). The Commission is not solely responsive to the capital needs and earnings of the utility; it may also consider the conditions of the utility's customers. While it may be true, as noted in the Court's opinion, that inflation is "painful" to electric utilities, the Commission in this case also observed:

"In reaching our decision in this case, we are guided not only by our duty to set rates which will allow the utility an opportunity to earn a reasonable return on its capital, but also by our concern for the affect of increased rates on the Company's customers. We readily acknowledge that the evidence of depressed economic conditions in the Applicant's service area has influenced our decision in this matter, but we believe it is not unreasonable to ask the Company's shareholders to share in the area's lean years inasmuch as they have prospered during the fat years."

As stated in the Commission's brief:

"[T]o advocate that the Commission may under no circumstances consider the

drought- and flood-caused temporary economic straights of this class of customer compared to the relative well-being of UP&L nor make a temporary accommodation between these interests for the period governed by this particular rate increase which would benefit the irrigation customers for only that limited period of time is to argue that the Commission has no authority to consider the broad public interest, and should instead be reduced to a group of investment analysts whose eyes cannot be lifted above the horizons of the comparable earnings and capital attraction test to consider the broad public interest."

It should also be noted that, as opposed to the depressed economic conditions of the area, Utah Power & Light's financial condition had improved dramatically. The Commission noted this improvement:

"In September 1975, Utah Power & Light's common stock was selling on the open market at eighty-two percent of book value. In early 1977, the market price climbed to approximately twenty percent above book value. The utility's Standard & Poor's bond rating improved from "A" in 1975 to "AA" in 1976. Earnings per share as of December 31st, 1976 were estimated at $4.75, a Company record. The $28,000,000 gross dividend paid in 1976 was also a record."

The Commission also noted that the president of Utah Power & Light indicated that its construction program, one of the largest and most aggressive in the country, will require annual rate increases substantially similar in amount to the 26% increase requested in this case. This Court is not in a position to substitute its judgment of the public interest for that of the Commission by noting the effect of inflation on the utility and ignoring the plight of the utility's customers.

## II.

The Court's opinion deals with only two of the issues raised on this appeal. For the sake of expediency, I too will only discuss those two issues.

## A.

The first issue is whether the Commission erred in excluding the Huntington plant and the Deer Creek coal mining properties from the rate base. The question is not whether the Commission erred in adopting 1976 as a test year or in choosing to use an historical rather than a projected test year. The Court's opinion has found no merit to such contentions. The only question is whether the Commission was not regularly pursuing its authority when it held that these two items should not be included in the rate base. The best way to show that the Commission was justified in holding as it did is simply to quote the Commission. In order no. 13448, in discussing the adoption of the 1976 test year, the Commission stated the following:

"Utah Power & Light's application is premised on a proposed test year which it characterizes as a 1976 test year adjusted for known and measurable changes. This characterization is somewhat disingenuous. At the time its application was filed, the Company had nine months of actual results for 1976 plus three months of projections. The Applicant began its construction of a test year by adopting a projected year-end rate base. It then adjusted this rate base by adding the cost of the Deer Creek Coal Mine acquired in March, 1977, and the cost of the second Huntington generating unit which was scheduled to go on line in June, 1977. The Applicant also reviewed its 1976 revenue and expense data to reflect 'the result of management decisions' about such matters as the projected growth in demand and anticipated inflation rates. *Tr.* at 727, 786–87. This revised data was then fed to a computer which simulated the company's operations for one year with the given conditions. The computer simulation, in turn, furnished new test year revenue and expense figures, which were then plugged into the test year as 'known and measurable adjustments.'

"The Commission Staff, in the person of Mr. Archie Holbert, strenuously objects to this proposed test year, which it

regards as 'a projected, or future test year ending December 31, 1977.' *Tr.* at 1773. The Staff urges, instead, the adoption of a test period based on the average of the actual beginning and ending balances in each of the 12 months of 1976. The Staff also adjusted its test year to include certain projected changes in 1977 which it regarded as known and measurable. These adjustments include an annualization of the rate increase granted in May, 1976, an increase in wage expenses due to a new union contract effective in January, 1977, and an increase in property taxes to reflect known changes. The Staff did not, however, include either the second Huntington unit or the Deer Creek Coal Mine in its test year rate base.

"Without question, valid arguments may be advanced in support of the Company's projected test year. A projected test year automatically folds the effect of continued inflation and growth in the utility's rate base into the basic rate-making data, thus resulting in the representation of conditions existing during the time the proposed rates are to be in effect. Presumably, a projected test year results in rates which remain adequate for a longer period of time, thus mitigating the necessity of further rate increases in the future. Moreover, the proposed projected test year is substantially identical to the test year adopted by the Commission in the last Utah Power and Light rate increase proceeding, *Application of Utah Power and Light Company*, IPUC Order No. 12467 (1976), and its use has been expressly sanctioned by the Idaho Supreme Court in *Agricultural Products Corporation v. Utah Power and Light Company*, 98 Idaho 23, 557 P.2d 617 (1976).

"There are however, several practical reasons for adopting an historical rather than a projected test year in this case. The Company's president has testified that annual increases in rates will be required regardless of the outcome of this proceeding. Consequently, the use of a projected test year will not delay future rate applications. Moreover, 1976 was a banner year for the Applicant, and the relevant data will not support a finding that a projected test year is necessary to avoid confiscatory attrition of the Applicant's earnings.

"But perhaps the most important practical reason for using an historical rather than a projected test year in this case is the questionable nature of the Company's projections. The Applicant projected a total Idaho sales increase of approximately 6.5 percent per year during the next five years, and alleged that the magnitude of its rate request is directly attributable to this forecasted growth. *Tr.* at 37, 426. It appears, however, that the Applicant's growth projections are little more than educated guesses. The Applicant conducted no independent investigation or studies concerning population growth for its service area, but instead relied upon growth projections for the State of Idaho as a whole and interviews with unspecified customers. The weight of the probative evidence suggests that the Company's projected increase in demand by residential, commercial, industrial and irrigation customers is seriously overstated. The interventors submitted credible testimony by Messrs. John Eyre, L. M. Walker, and Richard Schermerhorn which indicates that the population growth in the Applicant's service area will be approximately two to three percent, rather than the four to five percent envisioned by the Company. In addition, witnesses at the night hearings testified that future growth in electrical demand would decrease as a result of conservation efforts and the increased costs of irrigation pumping.

"We draw several inferences from this evidence concerning the Company's projections. The first is that the Applicant's projections of revenues and expenses in its Idaho service area are based on faulty empirical data and therefore unreliable. Consequently, the Company's projected test year must be regarded with an extremely skeptical eye. The evidence also

suggests that the Company's construction plans may be more grandiose than necessary to meet the needs of its ratepayers. The Applicant failed to demonstrate that it had given adequate consideration to either the effects of conservation or the possibility of encouraging conservation as an alternative to increased construction. For these reasons, we find the Company's projected test year to be unacceptable in this case.

"On a more fundamental level, this Commission has a strong preference for an historical rather than a projected test year. An historical test year allows the parties to work with actual data, while still recognizing projected changes which are reasonably certain to occur. This methodology offers an undistorted picture of the Company's financial posture during the course of its most recent year, and it accurately matches revenuew against expenses within a given time frame. If, in particular cases, the historical test year is inadequate to allow the Company a proper rate of return, the appropriate remedy is an adjustment of the test year to reflect known and measurable changes, rather than the substitution of a projected test year in which the basic data is totally in the control of the Company.

"For these reasons, we find that the Staff's proposed use of an actual 1976 test year is reasonable and should be adopted in this case." (Footnote omitted.)

On the exact issue in question, the Commission stated the following:

"2. *The Huntington Second Unit and the Deer Creek Coal Mine.*

"The Applicant's projected 1977 test year included two major additions to plant in service—the Deer Creek Coal Mine acquired in January, 1977 and the second Huntington generating unit which was ostensibly brought on line in June, 1977. Our adoption of the Staff's historical test year by definition excludes these items from rate base. The Applicant suggests, however, that they should nevertheless be included as known and measurable adjustments to rate base.

"The proposed inclusion of the Huntington second unit as a known and measurable adjustment does not require extended discussion. The Staff contends that the inclusion of the generating unit as a known and measurable change would essentially negate the test year concept because the generator is a revenue producing item and it would therefore be necessary to make adjustments to the test year revenues corresponding to the addition to rate base. The difficulties encountered in making such an adjustment in the present case are particularly severe because the unit ostensibly came on line approximately six months after the close of the test year. Although the impact of the generating unit on rate base is known, its effect on test year revenues is not sufficiently definite to require its inclusion as a known and measurable adjustment. Moreover, the practice of including generating units in rate base which come on line near the conclusion of proceedings before this Commission obviously deprives the parties of an acceptable opportunity to challenge the reasonableness of the expenditure by the Company. We therefore reject the inclusion of the Huntington second generating unit in rate base as a known and measurable adjustment.

"The Deer Creek coal mining property is a much closer question. On rebuttal, the Applicant pointed out that the coal mine is not a revenue generating property as such, and its inclusion as a known and measurable adjustment to rate base would not result in a mismatch of test year revenue and expenses. In addition, the Applicant points out that the cost of the property is readily measurable by examination of the written contract of sale on file with the Commission.

"On the other hand there has been no showing on this record that the Deer Creek Coal Mine is presently used and useful in the service of the Applicant's ratepayers, nor is there any evidence concerning the impact of the acquisition on

purchased coal costs. Unless the Company can show that the property is currently in use, it is for all intents and purposes indistinguishable from Plant Held for Future Use which has traditionally been excluded from rate base by this Commission. We do not think it unreasonable to put the burden of proof upon the Applicant to show that a proposed known and measurable adjustment to rate base is reasonable in cost and used and useful at the time the adjustment is made. No such evidence appearing on this record, we cannot accept the Company's rebuttal argument that the Deer Creek Coal Mine should be included in rate base as a known and measurable adjustment."

In denying the petition for rehearing, the Commission stated the following:

"Petitioner alleges that the exclusion of the Huntington Second Unit and Deer Creek Mine from the Company's rate base is erroneous. The record in this case clearly shows that the Deer Creek properties were not even acquired until after the end of 1976, the test year adopted by the Commission. *Tr.*, p. 2512. The record also clearly indicates that the Huntington Second Unit was not in operation until the middle of 1977. *Tr.*, p. 170. Therefore, the Huntington Second Unit constituted construction work in progress at the end of 1976, and would not be appropriately included in the rate base any more than any other construction work in progress (CWIP). Whether to include CWIP in rate base is a matter of discretion which has, for policy reasons, been consistently exercised by this Commission to exclude CWIP from rate base. Accord: *Re Black Hills Power and Light Co.*, 16 PUR4th 369 (S.Dak.1976); *Re Niagra Mohawk Power Corp.*, 16 PUR4th 369 (N.Y.1976); *Re Connecticut Light and Power Co.*, 17 PUR4th 1 (Conn.1976); and *Re Kansas City Power and Light Co.*, 15 PUR4th 153 (Kan.1976).

"Petitioner contends that the inclusion of Huntington and Deer Creek is proper as these are known and measurable changes. As the record clearly indicates the inclusion of Huntington Second Unit would be nothing more than an attempt, with no guarantee of accuracy, to predict income and expenses for a plant which has not yet operated for half a year. Further, the extent to which the Huntington Second Unit is used and useful to the ratepayers of Idaho is in serious question. The Petitioner's own testimony indicates that 'the company has contracted the sale of *up to* 110 MW of capacity' for the Huntington Second plant to the Idaho Power Company in 1977. *Tr.*, p. 170, 196. (Emphasis added). The amount of revenue from an unknown amount of power for 1977 can hardly be called a known and measurable change. If such speculation is allowed to cause additions to rate base, the integrity of the adoption of an historic test year adjusted for known and measurable changes would be cast in serious doubt. This Commission chooses to avoid the creation of a hybrid accounting system based partially upon historic figures, the value of which is certainty, and partially upon speculative measurements.

"On the question of the inclusion of Deer Creek Mine, Mr. Colby testified that Huntington and Deer Creek Mine 'are intertwined or computed, on this pro forma basis with that unit in there, with the coal mines in there, to be to the benefit of the Idaho ratepayer.' *Tr.*, p. 778. Again, income and expenses attributable to these two items could not be readily or accurately ascertainable and therefore could not be considered to be known and measurable. This is particularly so because Petitioner continually insisted upon using the year-end 1977 figures and upon 'backing into' the known and measurable change figures.

"Petitioner takes issue with the Commission's finding that Deer Creek Mine is not presently used and useful to the Company's ratepayers. Other than making the assertion that the mine is used and useful to the ratepayers and pointing to the testimony of Mr. Colby on page 777 of the Transcript, the Company makes no offer to prove that coal is actually being mined from Deer Creek and the effect of

such mining upon purchased coal costs. The Company was extended an open invitation to prove that Deer Creek is used and useful when the Commission said on page 10 of its Order:

Unless the Company can show that the property is currently in use, it is for all intents and purposes indistinguishable from plant held for future use which has traditionally been excluded from rate base by this Commission. We do not think it is unreasonable to put the burden of proof upon the Applicant to show that a proposed known and measurable adjustment to rate base is reasonable in cost and used and useful at the time the adjustment is made.

The record clearly indicates that even if the Deer Creek Mine was used and useful, it was not even acquired until 1977 and therefore would be properly excluded from the 1976 test year unless the income and expenses therefrom were known and measurable. Again, no such evidence was adduced or offered."

The Court, however, apparently believes that it cannot be said that these adjustments were " 'future' or unknown" because the properties were acquired before the proceedings before the Commission ended, and because Utah Power & Light "presented evidence of the revenues, if any, and expenses connected with those properties." The Court concludes that the Commission's finding on this issue is unsupported by the evidence and therefore must be set aside.

The burden of showing that these adjustments were known and measurable rests on the utility. The determination of whether or not that burden has been met rests initially with the Commission as the finder of fact. The Commission is at liberty to believe or disbelieve proffered contradicted evidence, i. e., the Commission can hold that simulated projections are too uncertain to be given binding weight if there is testimony to indicate that such is the case.

The mere fact that a plant goes into operation a few months before the Commission's final order does not automatically satisfy the utility's burden of showing that the adjustments are known and measurable. The utility must still produce evidence of the actual figures, and this evidence must be sufficient to show that there is a known and measurable change. The purpose of a historical test year approach is to provide known figures for rate setting. Here the Commission specifically declined to adopt a projected test year, and the Court has not said that was improper. Yet the Court does state that these adjustments are known and measurable because they have been in existence for a short time and because the utility introduced projected estimates of the revenues and expenses. Such a holding subverts both the test year approach and the authority of the Commission.

An examination of the record in the present case shows that the Commission did not abuse its discretion in holding that the utility had failed to show that these changes were known and measurable. The utility cites testimony at five places and refers to two exhibits to support its argument. These exhibits, and the testimony based thereon, were prepared *before* the Huntington unit went into operation. The utility made simulated projections of the expenses and revenues, and the only testimony given after Huntington went into operation stated that the plant was generally in operation in June 1977. The Commission in its brief more than adequately deals with these citations, and in the interest of expediency I will simply quote that brief:

"[T]he cited evidence shows nothing of the kind. First, Ex. 15 was identified at Tr. Vol. I., p. 163. According to the statement of the court reporter found at Tr. Vol. II., p. 330., the testimony in which the exhibit was identified was given on February 1 or 2, 1977. Therefore, the exhibit could not possibly have shown that the Huntington Second Unit was on line June 1, 1977, being fired by the Deer Creek Coal Mine because that exhibit was introduced approximately four months before June 1. Next, the testimony recorded at Tr. Vol. V., p. 777 was taken from hearings held (according to the court reporter's authentication appearing

on the page following p. 854 of that volume of the transcript) on March 29, 30, and 31, 1977. Again, this testimony could not possibly have shown that the Huntington Second Unit had come on line on June 1, and that it was being fired by the Deer Creek Coal Mines, because June 1 was still two months in the future. Finally, at Tr. Vol. XV., p. 2507–2508, the Company's witness Mr. Colby gave the following testimony as part of the Company's rebuttal case:

A.  . . . We've cited the coal mine properties, the Huntington Plant, property on the books at year end as perhaps the principal items. These are each in service, generally speaking, as of this particular date.

. . . . .

Q.  When did the Huntington—as we have called it, the 1977 plant—go in service?

A.  June 1977.

"Thus, the cited testimony does not state that the Huntington's Second Unit was on line beginning June 1, 1977, but merely states that it went into service in June of 1977. The testimony does not state that it was being fired by the Deer Creek Coal Mines nor does it state that the mine and the plant were dedicated to service to UP&L's ratepayers in the State of Idaho. Instead, the testimony merely says that the plant and coal mine were 'in service, generally speaking, as of this particular date.' According to the court reporter's certificate at p. 2575 of that volume, the date of the testimony was August 3, 1977. The cited testimony gave no indication whether the generating plant and the coal mine were being operated to serve UP&L's own customers or to satisfy its previously discussed contract with Idaho Power, nor whether it was necessary to operate them to meet the demands of UP&L's own customers.

"On p. 46 of the Appellant's Brief, it is stated that at no place in Mr. Holbert's testimony did he give any facts or indications that would prove the fact that the Company's projections were not reliable.

As previously stated on p. 49–50 of this brief, Mr. Holbert gave his opinion (Tr. Vol. XII, p. 1773) that the projections were based upon changes which could not be adequately measured because of the numerous variables and that the projections may not be valid in light of the drought and possible conservation on the part of the customers. This is certainly an indication that the projections were not reliable; as finders of fact, the Commission could rely upon this testimony or its own independent assessment of the projections to conclude that the projections were not reliable."

Thus, there was testimony before the Commission that these projections might not be valid, especially in light of the drought and possible resulting conservation by the customers. There was also testimony that the growth of the area projected by the utility was much too high. Finally, the utility stated that up to 111 MW of capacity of the Huntington plant was already contracted to be sold to Idaho Power. Based on this, the Commission as the finder of fact determined that the utility had failed to meet its burden of proof. The Commission felt that the projected revenues were too speculative, and that the actual portion of the Huntington plant which would be used for the Idaho ratepayers had not been sufficiently shown. There was substantial competent evidence to support the decision of the Commission, and it should be affirmed. The only way to achieve the result arrived at by the Court is to hold that the historical test year method is inappropriate. This, however, deals with a question not discussed by the Court.

B.

The second issue discussed in the Court's opinion is whether the Commission erred in eliminating the previously allowed one percent regulatory lag. The Court apparently believes that because such was allowed in the prior year, the decision to eliminate it in the following year is without foundation. The Commission found on this matter as follows:

"After due consideration of the evidence, we find that a return of 13.5% is just and reasonable in this case. This figure is identical to the cost of equity adopted in the last case, but we have eliminated any adjustment for regulatory lag. Our review of recent decisions in other jurisdictions suggests that this result is not unreasonable. The continued improvement in the utility securities market during the last year has prompted some commissions to lower the return on equity previously granted regulated utilities. See, e. g., Re National Fuel Gas Distribution Corp., 17 PUR4th 138, 156 (N.Y.P.S.C.1976).

3. *Attrition Allowance.*

"The Company proposes a .57% return on equity attrition allowance, which is apparently designed to compensate for regulatory lag and attrition. Both Mr. Epperson and Mr. Seeds oppose the adoption of this attrition allowance on the ground that it is a thinly veiled attempt to obtain a 16% return on equity. We find this proposed attrition allowance to be unsupported on the record and objectionable as a matter of regulatory policy. We note with approval the statement of Commissioner Ralls of the Michigan Public Service Commission, in a recent rate proceeding:

'If, on the other hand, the "earnings erosion allowance" is not in fact what it is purported to be—that is, an allowance for past failures to earn the authorized rate of return—but is instead an added correction factor for adverse future circumstances, then it is a distinctive and costly response to unquantified potential negative developments affecting the Company's operations. The nature of those negative factors remains mere speculation.

'Such an unquantifiable allowance for unspecified future events or circumstances is contrary to sound public policy. It stretches a safety net under the Company's earnings, while denying the Company's customers the same protection.

'The regulator's obligation to allow a reasonable opportunity to earn a fair rate of return has never been held to be a guarantee against every eventuality. Regulatory commissions can only discharge their obligation to utility customers by examining known data and applying measurable correction factors to that data, as derived from quantifiable events or circumstances. When that logical chain is broken, the regulatory process loses its essential rationality. Re Michigan Bell Telephone Co., 15 PUR4th 209, 248 (Mich. PSC 1976) [Commissioner Ralls concurring in part and dissenting in part].'

We find ourselves in complete agreement with Commissioner Ralls, and we note that an allowance for attrition adds further impetus to inflationary pressures, thus becoming a self-fulfilling prophecy. Moreover, section 61–622, *Idaho Code* prevents the sort of regulatory lag which has resulted in the adoption of an attrition allowance in other jurisdictions."

In denying the petition for rehearing, the Commission stated the following:

"The fourth allegation of error concerning rate of return stems from the Commission's refusal to recognize and allow a lag adjustment to the return on equity of .57%. In particular, the Applicant complains that the existing findings on this issue are inadequate. We believe the findings in the original order adequately explain the reasons for refusing to allow a lag adjustment. Such an adjustment constitutes either retroactive rate making, or speculation about unquantifiable future events which is inconsistent with the test year method of rate setting. Moreover, the proposed allowance would eliminate efficiency incentives by guarantying the utility a rate of return. These reasons for denying the proposed attrition allowance were set forth in the original order and we believe they are more than sufficient to support the ultimate conclusions."

I cannot agree with the Court that the Commission was bound to allow such an attrition allowance simply because it had

done so in the prior year and because it did not specifically state how the factors of inflation and the construction program affected that prior finding. The only question properly before this Court is whether the overall rate of return is just and reasonable. Given the improved financial condition of Utah Power & Light, I cannot find any error in the Commission's decision in this matter. Furthermore, I cannot believe that a determination by the Commission to allow an attrition allowance in one year binds the Commission to such an allowance in all future years. As stated in *Intermountain Gas Co. v. Idaho Public Utilities Commission*, 97 Idaho 113, 540 P.2d 775 (1975):

"[B]ecause regulatory bodies perform both legislative as well as judicial functions in these proceedings, they are not so rigorously bound by the doctrine of *stare decisis* that they must decide all future cases in the same way as they have decided similar cases in the past. So long as regulatory bodies adequately explain their departure from prior rulings so that a reviewing court can determine that their decisions are not arbitrary or capricious, orders based upon positions substantially different than those taken in previous proceedings can be upheld." *Id.* at 119, 540 P.2d at 781.

Without considering whether allowing an attrition allowance is a prior ruling or policy that could ever be considered binding, the Commission has sufficiently explained its decision not to allow this additional sum so that it cannot be said its decision is arbitrary and capricious.

## III.

Finally, the bootstrap argument the Court has used to substitute its opinion for that of the Commission should be noted. In *Agricultural Products Corp. v. Utah Power & Light Co.*, 98 Idaho 23, 557 P. 617 (1976), the Commission utilized an historical test year, adjusted prospectively for anticipated changes. This methodology was challenged, and the Court held that this "*is a proper method* to establish need for a rate change increase, where it is shown that the use of historical data will inadequately demonstrate real revenue needs, and where the future-year projections are shown by the applicant utility to be reasonably reliable and certain." *Id.* at 25, 557 P.2d at 619 (footnote omitted) (emphasis added). The Court did not impose this methodology on the Commission or hold that this was the only acceptable methodology.

In *Citizens Utilities Co. v. Idaho Public Utilities Commission*, 99 Idaho 164, 579 P.2d 110 (1978), however, this Court, citing only *Agricultural Products*, stated that "[t]his Court has stated before that test year data should be adjusted for anticipated and known changes where the changes are shown to be reliable and certain." *Id.* at 170, 579 P.2d at 116. The Court then held that the Commission erred in not including the cost of a billing machine in the test year as it was proved with reasonable certainty to be justifiably used in providing services.

Today the Court seizes upon these two cases for its holding that "[t]est year data should be adjusted for known and measurable changes where the changes are shown to be reliable and certain . . . . The Commission should include in the rate base all times which are proven with reasonable certainty to be justifiably used by the utility in providing services to its customers." To my mind, this usurps the authority of the Commission to determine the methodology of rate setting.

Although the Court in *Citizens* explained the justifications for adjusting test year data for known and measurable changes, it did not discuss how the Commission would not be "regularly pursuing its authority" if it chose not to follow such a method. The methodologies of ratemaking are extremely complex and diverse, and much controversy surrounds the question of which is best. So long as the final result produces a just and fair return, that question is for the Commission, not this Court. Although the Commission is following an approach approved by this Court, nonetheless, the Court should temper its opinions to recognize the proper relationship between the Commission and the Court.

### IV.

It has been said that the public utilities system acts as an arm of the legislature, and that the actions of the Commission are those of the legislature, with the same force and effect as law. In earlier days both the legislature and the Commission without or virtually without any staff. Today the legislature is well staffed, and can at its will increase its staff. It has also seen fit to appropriate funds to increase the staffing of the Commission, thereby removing the handicap under which the Commission used to operate in its dealings with the utilities doing business in Idaho. The Court, of course, has no such staff, and if it be thought that there are members of the Court possessing the requisite expertise to knowledgeably second-guess the ·Commission, I confess to not being one. It is hopefully within my realm to consider whether the Commission has regularly pursued the authority granted it by the legislature, and to consider allegations of constitutional violations. In earlier times the Court's appellate opinion appears to have been ordinarily sought only on those issues—usually narrowed down to a claim that a given utility rate set by the Commission was confiscatory in nature.

In present times, however, the restrictive provisions of I.C. § 61–629 seem to be forgotten. The Court is being asked to redetermine ratemaking and classification issues which are properly the business of only the legislature or its lawful agency, the Public Utilities Commission. Recently we were asked by a utilities customer, albeit a substantial one, to stay indefinitely a rate increase allowed by the Commission. *FMC Corporation v. Idaho Public Utilities Commission*, No. 13991, stay order issued February 23, 1981. The Court minutes should reflect a single vote which would have refused the stay order and would have required the Court's written opinion disclosing to the parties involved and the consuming public how the decision to stay was reached. That determination, documented only by an order granting the stay, was a landmark decision in the public utility field, but accomplished with only a casting of votes. Yet the decision to stay during the appeal is, in my opinion, of more far reaching consequence than will be the opinion itself, which may eventually pass upon the merits of the appeal—assuming that those issues have not become moot, as has been often the case. Meanwhile, so we were told, and in a manner most logical and reasonable, the function of the Commission has been severely undermined, if not entirely eroded.

The Court, comprised of but five members, who so far as known to me are learned in the law only, simply does not have the authority or ability to supplant the Public Utilities Commission in the regular pursuit of its duties. Rate-making decisions are properly to be made either by the legislature or by the Commission which the legislature created for that very purpose. To those who are dissatisfied with the Commission's decision, other than under I.C. § 61–629, it seems to me that any petition for redress should be made to the legislature itself.