690 P.2d 901

**In the Matter of the Application of UTAH POWER & LIGHT COMPANY for Approval of its Proposed Electric Rate Schedules and Electric Service Regulations.**

**UTAH POWER & LIGHT COMPANY, Appellant,**

v.

**IDAHO PUBLIC UTILITIES COMMISSION, Respondent.**

No. 14872.

Supreme Court of Idaho.

Oct. 23, 1984.

Wesley F. Merrill and Stephen S. Dunn, argued, Pocatello, for appellant.

Jim Jones, Atty. Gen., Michael S. Gilmore, argued, Deputy Atty. Gen., and Lynn E. Thomas, Sol. Gen., Boise, for respondent.

BISTLINE, Justice.

On March 1, 1982, Utah Power & Light (UP&L) applied with the Idaho Public Utilities Commission (Commission) for a general rate increase of $23,762,000, or an approximately 29.1 percent rate increase for its Idaho customers.

On May 24, 1982, UP&L and the Commission staff stipulated that 15.75 percent was a reasonable rate of return. The stipulation did not purport to bind the Commission and provided that neither party should be deemed thereby to have stipulated to the facts, principles, methods or theories employed by the other.

Addressed at the June and August 1982 rate hearings was UP&L's purchase on September 30, 1981, of C.P. National, a former resale customer whose wholesale rates paid to UP&L were regulated by the Federal Energy Regulatory Commission, which purchase turned C.P. National's former customers into direct retail customers of UP&L regulated by the Utah Public Service Commission. UP&L purchased the C.P. National property for $27,949,191, which included a $6,475,503 acquisition adjustment representing C.P. National's tax liability from the recapture of investment tax credit and accelerated depreciation. $1,992,462 of the acquisition adjustment was allocated by UP&L to its customers in the State of Idaho. The Company expected to spend approximately $7,000,000 in the following five years to upgrade the C.P. National system.

On September 27, 1982, the Commission issued Order No. 17602 which allowed UP&L to include in the rate base the book value of the C.P. National plant but excluded the acquisition adjustment from the rate base. The Commission awarded UP&L a 15.25 percent return on rate base rather than the 15.75 percent stipulated by the parties.

On October 13, 1982, UP&L applied for rehearing on both the C.P. National and the rate of return issues. On October 22, 1982, UP&L petitioned for a $114,000 adjustment to its revenue requirement as provided for pursuant to the Commission's Order No. 17602.

On November 10, 1982, the Commission issued Order No. 17707 allowing UP&L's requested revenue requirement adjustment and denying the Company's petition for rehearing on the C.P. National acquisition adjustment and rate of return issues.

This appeal follows.

■ Initially we note our standard of review of ratesetting orders:

"The function of rate making is legislative and not judicial. The commission as the agency of the legislative department of government exercises delegated legislative power to make rates. So long as it regularly pursues its authority and remains within constitutional limitations, the courts have no jurisdiction to interfere with its determinations.

" 'It is fundamental that the judicial power to declare legislative action invalid upon constitutional grounds is to be exercised only in clear cases. The constitutional invalidity must be manifest, and if it rests upon disputed questions of fact, the invalidating facts must be proved.' [Citation omitted.]

" ' ... [T]he judicial function does not go beyond the decision of the constitutional question. That question is whether the rates as fixed are confiscatory. And upon that question the complainant has the burden of proof, and the court may not interfere with the exercise of the state's authority unless confiscation is clearly established.' " [Citation omitted.]

*Petition of Mountain States Telephone & Telegraph Co.,* 76 Idaho 474, 480, 284 P.2d 681, 683 (1955).

Thus, the Commission's ratesetting order carries with it the presumption of validity. Its order in this case will be affirmed unless UP&L meets its heavy burden of establishing that the order violated its constitutional rights or that the Commission did not regularly pursue its authority. *Citizens Utility Co. v. Idaho Public Utilities Commission,* 99 Idaho 164, 579 P.2d 110 (1978); *Mountain States, supra; Artesian Water Co. v. Public Utilities Commission,* 40 Idaho 690, 236 P. 525 (1925).

## I. C.P. NATIONAL

UP&L contends that the Commission erred in refusing to include in rate base the acquisition adjustment paid by UP&L for the C.P. National property. UP&L argues that the full purchase price paid for the C.P. National property should be included in rate base because this cost represents both the true cost of the property adjusted to reflect accepted accounting principles and also the value and benefit received by the Company's ratepayers.

The acquisition adjustment represents C.P. National's tax liability from the recapture of investment tax credit and accelerated depreciation passed through to its ratepayers under "flow-through" accounting principles and equals that amount necessary to adjust C.P. National's records to a fully normalized accounting basis.

Federal income tax laws permit regulated utilities to depreciate their investments in utility property under accelerated methods rather than straight-line methods. In the straight-line method of depreciation, the utility deducts from its taxable income equal annual amounts of depreciation over the life of the asset, whereas in accelerated methods the utility deducts greater amounts initially and smaller amounts during the later years of the asset's life. For ratemaking purposes, regulatory bodies generally allow utilities to charge ratepayers depreciation expenses for their investment under straight-line methods. Thus, a public utility may elect the benefits of accelerated depreciation for income tax purposes but depreciate the property for ratemaking purposes under the straight-line method. When this occurs, regulators choose one of two methods to account for the difference in depreciation for federal income tax and regulatory purposes. These two methods are known as "normalization" and "flow-through" accounting.

"Normalization occurs when a utility uses an accelerated depreciation method for income tax purposes, but calculates its tax expense for ratemaking purposes as if it had taken straight-line depreciation. Thus, in the early years of an asset's life the utility collects more from its ratepayers than it actually pays in taxes. This excess amount is usually credited to a reserve account for deferred taxes.... Th[is] reserve account provides a source of funds, for accounting purposes, with which to pay the utility's increased tax bills during the later years of the asset's life. This increased tax liability is caused by the fact that, under a normalization of accounting for ratemaking purposes, a crossover point is reached, when actual taxes paid by the utility begin to exceed revenues collected for taxes."
*New England Telephone & Telegraph Co. v. Public Utilities Commission,* 390 A.2d 8, 18–19 n. 4 (Me.1978).

"Flow-through is a ratemaking technique by which rates are based upon the *actual* taxes to be paid in that year by a utility taking accelerated depreciation. The tax "savings" are credited to income, thereby reducing the utility's revenue requirement. In theory, this results in lower rates during the early years of an asset's useful life, but in higher rates after the cross-over point has been reached."
390 A.2d at 19 n. 6.

Thus, when a utility uses flow-through accounting for ratemaking purposes, its rates are initially set lower than they would be under normalized accounting, and its ratepayers make no contributions in the rates

during these early years to the higher taxes that the utility must pay in the later years of the asset's life. Normalization accounting, however, sets a utility's rates as if the utility used straight-line depreciation for federal income tax purposes thereby normalizing the income tax effects associated with depreciation, for ratemaking purposes. C.P. National used flow-through accounting principles resulting in lower rates for its ratepayers. The acquisition adjustment here at issue represents that amount necessary to recapture the depreciation so accelerated and to convert to normalization accounting.

I.C. § 61–523 provides that "The commission shall have power to ascertain the value of the property of every public utility in this state and every fact which, in its judgment, may or does have any [b]earing on such value."

In *Artesian Water Co., supra,* this Court set forth the standard for determining whether the Commission has properly determined the value of property to be included in rate base. The Court rejected limiting the Commission's determination of value to any one rule or theory. The Court instead held that the Commission must determine the "fair value" of the property being used by giving fair consideration to the "cost of reproduction or replacement, actual cost, depreciation, earning capacity, present service condition, investment, the service furnished and any and all other relevant evidence, ..." *Id.* 40 Idaho at 701, 236 P. 525. The Court stated that:

"[V]alue, as here used, does not strictly mean market value or sale value; for the value of the property of a utility for rate-making purposes must be measured somewhat by the use to which it is devoted.... 'What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it ... than the services rendered by it are reasonably worth.' (*Smyth v. Ames,* 169 U.S. [466] 547, 18 Sup.Ct. [418] 434, 42 L.Ed. [819] 849.)"

*Id.* at 700, 236 P. 525.

In *Citizens Utilities Co. v. Idaho Public Utilities Commission,* 99 Idaho 164, 171, 579 P.2d 110, 117 (1978), this Court stated that the "Commission should include in the rate base all items which are proven with reasonable certainty to be justifiably used *in providing services.*" (Emphasis added.)

The Commission, in excluding the C.P. National acquisition adjustment from rate base, accepted staff witness Holbert's recommendation:

"Holbert reduced the Company's plant in service account by removing the acquisition adjustment of UP&L's purchase of the C.P. National plant. The acquisition adjustment resulted from increased income tax liability from the purchase of this utility. Holbert argued that the acquisition would not benefit Idaho ratepayers and therefore the premium paid over book value should be borne by the shareholders.

. . . .

"The acquisition adjustment was indeed paid to convert from flow-through to normalization accounting. However, *the benefits of flow-through accounting accrued to the C.P. National (and not the Idaho) ratepayers.* While we do not find it unreasonable for the Company to acquire a resale customer, the limited benefit of such an acquisition does not warrant saddling the current ratepayers with the acquisition adjustment. Accordingly, we accept the Staff recommendation."

Order No. 16702, R., pp. 127–28 (emphasis added).

The Commission based its determination of C.P. National's value to the Idaho ratepayers on the basis of testimony that the acquisition adjustment was being paid not for any tangible value added to the property but merely to recapture investment tax credit and accelerated depreciation, the benefit of which accrued to C.P. National ratepayers; that UP&L would have to spend $7,000,000 in the next five years to upgrade the C.P. National system; that no

significant benefit would accrue to the Idaho ratepayers from the purchase of C.P. National; that UP&L was merely exchanging a retail customer for a wholesale one, since C.P. National previously obtained virtually all of its power from UP&L; that sensitivity studies which did not take into account the $7,000,000 future expenditure necessary to upgrade the system indicated that the acquisition would have no material effect on the rate of return in the various jurisdictions; and that payment above book value would primarily benefit the stockholders of UP&L since it represents growth and expansion of the company which may not be in the best interests of the current ratepayers. Testimony of Archie Holbert Volume 1, pp. 132–34 (August 1982 hearings).

■ UP&L contends that the Commission erred in refusing to consider evidence presented by it that the purchase of the C.P. National property would indeed benefit the Idaho ratepayers. Company witnesses testified that the acquisition would have a positive effect on the Company's ability to finance and maintain itself as a healthy entity; that Idaho would have allocated to it a portion of C.P. National's low cost generation facilities; that UP&L would be in a better position to do load and resource planning and to improve the integrity of the system. The Commission, as finder of fact on the question of value, need not weigh and balance the evidence presented to it but is free to accept certain evidence and disregard other evidence. In any event, we are not persuaded that the Commission did not take UP&L's evidence into consideration in deciding to include the net book value of C.P. National in rate base based on its determination that the acquisition of the plant provided some limited benefit to Idaho ratepayers. The Commission merely determined that the acquisition adjustment paid for such plant did not benefit Idaho ratepayers and so would not be included in rate base.

■ There is substantial evidence in the record to support the Commission's determination that the acquisition adjustment was paid merely to recapture accelerated depreciation and investment tax credit, the benefit of which accrued solely to C.P. National's former ratepayers and that the limited benefit of the acquisition of the C.P. National plant to the Idaho ratepayers did not justify adding the acquisition adjustment to the Idaho rate base. As in *Artesian Water Co.*, value for the purpose of I.C. § 61–523 does not necessarily mean market or sale value, but is "the value of that which [the utility] employs for the public convenience." "[T]he public is entitled to demand that no more be exacted from it ... than the services rendered are reasonably worth." The Commission found that the acquisition adjustment paid by UP&L did not represent a measure of value for the benefit of the Idaho ratepayers and that the services to be rendered from the C.P. National plant were insufficient to justify saddling the Idaho ratepayers with the acquisition adjustment paid merely to recoup benefits passed along to former C.P. National ratepayers under flow-through accounting principles.

UP&L cites this Court to several prior Commission orders allegedly inconsistent with its order in this case. *See Re Boise Water Corp.*, 59 PUR3d 86 (1965); *Camas County v. Idaho Telephone Co.*, 52 PUR3d 432 (1963); *Re Washington Water Power Co.*, 33 PUR3d 88 (1960). We have reviewed those orders and find that the Commission merely determined on a case by case basis whether acquisition adjustments paid by utilities constituted value to the ratepayers sufficient to be included in rate base. Those cases present differing factual situations from the case at bar and are not binding on the Commission or this Court on appeal.

## II. RATE OF RETURN

UP&L argues that there is not substantial evidence to support the Commission's setting of a 15.25 percent rate of return on equity. We disagree. The Commission's rate of return determination of 15.25 percent was well within staff witness Carlock's range of reasonableness of 14.5 per-

cent to 16 percent using the comparable earnings method and her range of reasonableness of 14.8 percent to 16.3 percent using the discounted cash flow method.

Carlock was the only witness filing testimony regarding the rate of return which should be awarded to the Company. Carlock based her testimony regarding her ranges of reasonableness on analysis of data found in Standard & Poor's 400 Industrials for the period of 1977 to 1981, Moody's 24 Electric Utilities and Moody's 9 Gas Distribution Companies, also introduced in evidence. She introduced tables and charts showing trends in earnings for industrials, and electric and gas utilities. In arriving at her discounted cash flow range she used the following formula:

$$K_s = D_1/P_o + g$$

where $K_s$ = capitalization rate, discount rate or required rate of return; $g$ = growth rate; $P_o$ = current price; and $D$ = dividend.[1]

 The Commission acted within its authority in setting UP&L's rate of return within Carlock's ranges of reasonableness. The Commission was not bound to accept Carlock's recommendation of 15.75 percent return on equity, which admittedly was merely one point within the ranges of reasonableness she found applicable.[2] The Commission was not bound to accept this one point within the ranges but was free to choose another equally reasonable point within the ranges of reasonableness. In fact, the authorized return on equity falls at the exact midpoint of Carlock's comparable earnings range of reasonableness.

As this Court stated *In Intermountain Gas Co. v. Idaho Public Utilities Commission,* 97 Idaho 113, 128, 540 P.2d 775, 790 (1975):

"The Constitution permits a 'broad zone of reasonableness' in rates of return, and we will not hold that any rate of return lower than the precise average rate of return of comparable companies or beneath the rate of return that expert witnesses testify is necessary under the 'capital attraction' or 'comparable earnings' test is necessarily beyond the 'broad zone of reasonableness' permitted by the Constitution."

"The questions of 'cost of equity' and 'rate of return' are matter which raise extremely complicated issues. Deciding these questions is a function of the Idaho Public Utilities Commission and these questions are within the Commission's area of expertise." *Citizens Utilities Co. v. Idaho Public Utilities Commission,* 99 Idaho 164, 173, 579 P.2d 110, 119 (1978). The Commission based UP&L's rate of return on substantial evidence in the record. We conclude that the rate set is not confiscatory or in violation of the Company's constitutional rights.

UP&L contends that the Commission erred by relying on evidence outside the record in setting its rate of return on equity at 15.25 percent. In addition to relying on evidence and testimony submitted by staff witness Carlock, the Commission relied on the following factors: (1) UP&L's stock had remained attractive to investors, with a favorable market price and market book ratio; and (2) the Company had not incurred extensive construction costs as in years past. UP&L is correct in the contention that the Commission relied on information outside the record in making these determinations. The Commission in Order No. 17602 stated that:

"UP&L stock has remained attractive to investors, with a favorable market price and market-book ratio. ... Finally, since its last case, the Company has

---

**1.** Counsel for UP&L stated at the August hearings that although he did not agree with either the methodology or the analysis upon which Carlock's conclusions were based "because the final conclusion or the rate of return on common equity that she comes up with of 15.75 is consistent with the figure which the Company stipulated to for purposes of expediting the

hearing, we will have no cross-examination of the witness." Tr., Vol. 1, p. 123 (August 1982).

**2.** Carlock merely testified that "The staff and the Company have stipulated to 15.75 percent on cost of equity capital. The 15.75 percent stipulated cost of equity is well within the range of reasonableness which I have recommended." Tr., Vol. 1, p. 98 (August 1982).

not incurred extensive construction costs as in years past. This is illustrated by the deferral of the Hunter 4 unit, as well as the Company's efforts to limit its participation in the IPP project."

R., p. 132.

UP&L argued in its petition for rehearing that the Commission, in making these statements had not relied on any evidence, testimony, or information in the record.

The Commission in its order denying rehearing conceded that its statements as to the attractiveness of UP&L's stock were not founded on information in the record:

"Though our comment regarding the attractiveness of the Applicant's stock was not based on an express statement by either expert, the basis for it is readily ascertainable. As Commissioners, we have a duty to stay abreast with the market values of the stocks of the various electric utilities operating within the State of Idaho. At the date of signing of Order No. 17602 and during the case, only UP&L was selling near its book value. Neither of the cases cited by the Applicant in its Petition suggests that the Commission must base every finding and conclusion on statements made during a hearing. Some findings and conclusions are based on common knowledge. The attractiveness of UP&L stock is common knowledge to even the most casual observer of the investment community."

Order No. 17707, R., p. 167.

Commission in its order denying rehearing stated that UP&L had misconstrued its statements regarding construction costs:

"Utah Power takes exception to our conclusion that the Company has not incurred construction costs as extensive as in years past. Applicant contends that the record did not show UP&L limiting its participation in the Intermountain Power Project (IPP), that construction costs in future years will exceed 1981 costs, that the conclusions are not grounded in facts in the record and that no indication was given by the Commission of dissatisfaction with the evidence.

"To begin with, Commission Order No. 7602 did not say that the Applicant has limited its participation in IPP; we stated that efforts have been made to do so. Moreover, there has yet to be a determination in the Idaho jurisdiction that energy from IPP is required to supply the load imposed by this jurisdiction."

Order No. 17707, R., p. 169.

The Commission did not, however, deny that it had relied on information outside of the record regarding its conclusions as to UP&L's construction costs. The Commission, in its order denying rehearing, additionally took official notice of the following:

"Additionally, we take official notice of the fact that Applicant has reached a tentative agreement to 1) reduce its participation in IPP from 25% to 4%, and 2) reduce the total project by approximately one-half. It is also a matter of record that Hunter 4 has been deferred and that Hunter 3 will not come on line until 1983."

*Id.*

■ This Court in *Boise Water Corp. v. Idaho Public Utilities Commission,* 97 Idaho 832, 842, 555 P.2d 163, 173 (1976), held that the Commission may rely on its own expertise, if it so chooses, but must refer to matters in the record to substantiate its conclusions or place such matters in the record itself. "That much at least is required in order to enable the reviewing court to determine that the Commission's decision is not capricious or arbitrary and thus not a denial of due process of law." *Id.* The Commission improperly took official notice of matters not placed in the record, both in its Order No. 16702 and its Order No. 17707 denying rehearing. We find no error in the Commission relying on its own expertise or on its taking notice of matters it considered common knowledge, but deem improper its failure to give the parties to this action an opportunity to respond to or refute such matters noticed. We do not set aside the Commission's order for that reason because the Commission's

decision is independently supported, as discussed *supra*, by Carlock' testimony.

UP&L lastly argues that the Commission erred in decreasing its rate of return from 15.75 percent recovered under its previous rate order to 15.25 percent. In UP&L's prior rate application, No. U–1009–114, the Commission awarded the company a return on equity of 15.16 percent with an attrition adjustment of .59 percent to allow for inflationary pressures which had resulted in "unmanageable increases in costs." Order No. 17707, R., p. 168. The Commission stated that although there was no evidence in the record on the question of attrition that:

"[W]e must take it upon ourselves to make an allowance for this very real problem. We will accomplish this by increasing the Company's allowed return on equity from the 15.16% found above to 15.75%. We do not make this adjustment easily, but feel that some recognition of the inflationary pressures on the Company must be recognized, and direct the Staff and the Company, in future cases, to address the problem head on. In making this adjustment, it is our intent to allow the Company the opportunity to realize the 15.16% return found reasonable."

*Id.*

█ In the present case, the Commission increased UP&L's rate of return from 15.-16 percent to 15.25 percent. The Commission, however, did not award the Company the .59 percent attrition allowance awarded in the prior proceeding. UP&L argues that the Commission thus acted in excess of its authority under our decision in *Utah Power & Light Co. v. Idaho Public Utilities Commission*, 102 Idaho 282, 629 P.2d 678 (1981). *Utah Power & Light* involved a case in which the Commission had in a prior rate order granted UP&L a one percent attrition allowance which allowance was eliminated in the rate order then under consideration. The Court held this improper as "the factors of inflations and an expansionistic construction program [present under the earlier order] continue

to exist and apparently were not considered by the Commission." *Id.* at 285, 629 P.2d at 681. *Utah Power & Light* is inapposite. In the present case, the Commission addressed inflationary pressures directly through an allowance for known and measurable change adjustments to the test year along and through an inflationary adjustment to other revenue and expense items based upon three commonly used price indices. The latter adjustment was allowed to operate beyond the confines of the test year as is demonstrated by the Commission's award in Order No. 17707 of $114,000 to UP&L as an adjustment to its revenue requirement. Contrary to the situation in *UP&L I*, here the Commission did consider the factor of inflation present under its earlier order in eliminating from rate base the imprecise .59 percent attrition allowance awarded in the prior order, and in increasing the Company's rate of return and precisely quantifying the inflationary pressures experienced by the Company. We find no error in the Commission's decision to so quantify the inflationary pressures experienced by the Company and to eliminate the .59 percent attrition adjustment.

The Commission's Order Nos. 17602 and 17707 are *affirmed.*

DONALDSON, C.J., and OLIVER, J. Pro. Tem., concur.

BAKES, Justice, dissenting:

I dissent from the commission's devaluation of the company's property acquired from C.P. National for purposes of the rate base. The commission disallowed a portion of the purchase price from the rate base by placing the value, not at what the utility paid for the asset, but by valuing the asset on the basis of the seller's adjusted basis for tax purposes, *i.e.,* C.P. National's book value derived from cost less accelerated depreciation. For the reasons which follow, I fail to see how the seller's book value has any relevance to the market value of the asset where a utility has purchased an asset in an arm's length transac-

tion, particularly where that book value reflects accelerated depreciation.

Generally accepted accounting principles permit—even require—that an asset be depreciated on the books of the corporation to reflect its diminishing useful life. That depreciation is regularly reflected in a straightline basis over the useful life of the asset. However, the United States Congress has enacted legislation permitting purchasers of new plant and equipment to depreciate assets more quickly than the useful life of the asset. This "accelerated depreciation" is allowed in order to encourage investment in plant and equipment, usually during recessionary periods. Accelerated depreciation permits purchasers of new plant and equipment to take extraordinarily high amounts of depreciation during the early years in order to encourage investment in new plants and equipment. As an even greater encouragement to invest in new plants and equipment, the federal tax laws permit a taxpayer to take as a direct credit against the federal income tax a certain percentage of the amount of the purchase price of certain types of new plant and equipment. Accelerated depreciation artificially lowers the value of an asset on the books of the corporation by depreciating it much more quickly than the asset actually physically deteriorates. Accordingly, where an owner of an asset has taken accelerated depreciation, the value of the asset on the books of the corporation will in nearly every case be substantially less than its fair market value.

In the event a corporation which has taken accelerated depreciation and investment tax credit disposes of an asset prior to the end of its useful life, there must be a recapture of at least some of the accelerated depreciation and tax credits previously claimed by the seller of the asset. Recapture of accelerated depreciation, by its very definition, only occurs when the asset's sale price on disposition exceeds the amount of accelerated depreciation previously taken. This federal statutory tax scheme reflects the obvious conclusion that accelerated depreciation recapture reflects

a lower book value than the actual market value of an asset.

Therefore, when two parties negotiate the purchase of an asset which has been the subject of accelerated depreciation and investment tax credits, while both are obviously looking to obtain the best price possible, the seller must also consider, as C.P. National did in this case, the tax consequences that it must face from the recapture of accelerated depreciation taken and the repayment of investment tax credits in arriving at a price for which it will willingly sell the asset.

That is what occurred in this case. C.P. National was willing to sell the asset in question to Utah Power & Light for $27,949,191 which to C.P. National reflected both the $21,473,688 book value of the asset, i.e., its cost less accelerated depreciation, plus accelerated depreciation and investment tax credit which it would be required to recapture in the amount of $6,475,508. The addition of those recaptured items merely brought the value of the asset up to and nearer in line with what the book value would have been if the asset had been depreciated on a cost-less-straightline depreciation over the useful life, rather than on an accelerated basis. Since there is no evidence that the purchase price was anything other than the result of arm's length bargaining, and since the commission seems to agree that the purchase benefited Idaho as demonstrated by the commission's inclusion of at least $21,473,688 of the purchase price into the rate base, then I believe that our cases require that the entire purchase price be included in the rate base.

In determining at what value an asset should be included in the rate base, this Court stated in *Boise Artesian Water Co. v. Public Utilities Comm'n*, 40 Idaho 690, 236 P. 525 (1925), that the commission should "give fair consideration to all the evidence relating to value." 40 Idaho at 701, 236 P. 525. In an analogous situation, in determining whether a utility's expenditures are reasonable, we have stated that

"the pressures of a competitive market and the fact of arm's length bargaining for goods and services allows us to assume, in the absence of a showing to the contrary, that such operating expenditures are legitimate." *Boise Water Corp. v. IPUC*, 97 Idaho 832, 838, 555 P.2d 163, 169 (1976). By analogy, the value at which an asset is purchased by a utility in an arm's length transaction, in the absence of a showing to the contrary, should be the value included in the rate base. Here Utah Power's evidence disclosed that it purchased C.P. National's assets for $27,949,191.00 in an arm's length transaction. There is no showing to the contrary. The fact that the seller of the asset, C.P. National, was permitted by federal tax law to depreciate the asset faster than its useful life, and in the sale insisted that the purchase price reflect the fact that it must recapture that depreciation, is not any relevant evidence of a contrary showing that the value of this asset was anything less than the price arrived at in the arm's length bargaining between the two parties. This conclusion is supported by the fact that in the past the commission has permitted inclusion of assets on the actual sales basis and has not required reduction in the rate base to reflect the acquisition adjustment. *Re Washington Water Power Co.*, 33 P.U.R.3d 88 (1960); *Camas County v. Idaho Telephone Co.*, 54 P.U.R.3d 432 (1963); *Re Boise Water Corp.*, 59 P.U.R.3d 86 (1965). *Accord, Hobbs Gas Co. v. New Mexico Public Service Comm'n*, 94 N.M. 731, 616 P.2d 1116 (1980). In *Re Washington Water Power Co.* the Idaho commission was required to determine the value of electric properties purchased by Washington Water Power Company from Bunker Hill Company. The commission stated:

"The acquisition adjustment amount is the difference of the original cost and the amount paid by the company for the electric properties of the Bunker Hill Company in Kellogg, Idaho. This purchase was a result of an arm's length transaction and is the result of the actual purchase price in which valuable considerable was paid for tangible assets. ... We will

allow the acquisition adjustment to remain in the rate base ...." 33 P.U.R.3d at 93.

The commission's valuation was not based upon competent evidence and therefore should be set aside with directions to include the entire purchase price in the rate base. *Boise Artesian Water Co. v. IPUC, supra.*

SHEPARD, J., concurs.